MONTGOMERY WARD & CO., Incorporated, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 16981.

United States Court of Appeals
Sixth Circuit.

May 9, 1967.

Narcisse A. Brown, Chicago, Ill., for petitioner. Roy W. Short, Cincinnati, Ohio, Richard C. Scheidt, William F. McNally, Christoper J. Michas, Chicago, Ill., on the brief. Davis, Farley, Short & Roberts, Cincinnati, Ohio, of counsel.

George B. Driesen, N. L. R. B., Washington, D. C., for respondent. Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, George B. Driesen, Allen M. Hutter, Attys., N. L. R. B., Washington, D. C., on the brief.

Before WEICK, Chief Judge, CELEBREZZE, Circuit Judge and NEESE,* District Judge.

CELEBREZZE, Circuit Judge.

Montgomery Ward & Company (Company) seeks to reverse the decision and order of the National Labor Relations Board (Board) entered on November 5, 1965. The Board has cross-petitioned for enforcement of its order. The Board found that the Company violated Section 8(a) (3) and (1) of the National Labor Relations Act, 29 U.S.C. Section 158(a) (1), (a) (3), by discharging employees Bishop, O'Bannon, Wright, Robinson, Milby and McCandless, as part of a scheme to eliminate the Union's leaders. The Board found the Company also violated Section 8(a) (1) of the Act by coercively interrogating its employees, and by threatening to suspend, and, in fact, suspending employees Wright, Robinson, Bishop and O'Bannon for refusing to answer a Company questionnaire. Further, the Board found that the Company violated Section 8(a) (5) and (1) of the Act by refusing to bargain with the Union.

In October, 1963, Montgomery Ward opened a catalog store in Louisville, Kentucky. The Company employed approximately twenty people. In March, 1964, an organizational campaign was begun by the Union.[1] On April 20th, an International Union representative sent a letter to the Company stating that the Union represented its employees, and that employees Robinson, Milby, Bishop, McCandless, Wright, and Swindall were members of the organizing committee. The Union sent a telegram to the Company on April 22, 1964 demanding recognition. The Union then decided to let the Board determine the question of representation through an election, and a representation petition was filed on April 24, 1964. An election was scheduled for June 12, 1964, but was never held because of the filing of the charges in the initial case, which was later consolidated with other charges filed thereafter.

A brief chronology of the events will be helpful. On May 5, 1964, Store Manager Frazier spoke to all the Company employees. On May 19th, Frazier made his second speech. On June 3rd, the Company laid off employees McCandless and Milby. On June 5th, Frazier made his third and final speech to all Company employees. The election scheduled for June 12th was not held. On July 27th, a complaint was filed by the Board. In August, employees, Robinson, Wright, Bishop, and O'Bannon were suspended two days for refusing to answer a Company questionnaire. In August, employee Robinson quit after she was transferred to a different job. On September 8th, employee Wright was discharged. On October 14th employees Bishop and O'Bannon were discharged.

1. Whether the Company violated Section 8(a) (1) of the Act by its preelection conduct and speeches to the employees?

We do not find it necessary to recite the speeches Manager Frazier delivered to his employees. On June 5th Frazier promised the employees they would receive time and a-half pay for over forty hours. On June 10th, Frazier

* Honorable C. G. Neese, United States District Judge for the Eastern District of Tennessee, sitting by designation.

1. Retail Clerks Union, Local No. 445.

told employee Robinson that a Company merit raise would amount to more money than a Union raise. We find there is substantial evidence to support the Board's finding that the speech of June 5th and the discussion of a merit raise with employee Robinson violated Section 8(a) (1) of the Act.

2. Whether the Company violated Section 8(a) (1) of the Act by suspending employees for failure to answer a questionnaire relative to the unfair labor practice charges?

In August the Company attorneys distributed a questionnaire to the employees asking whether any management or supervisory employee questioned the employees regarding their interest, sympathy and activity in the Union. The questionnaire also asked if any employee had been interviewed by a representative of the National Labor Relations Board, and whether a written statement was given to the representative of the Board. The employees were told that their answers would not affect their jobs. Employees Robinson, Wright, Bishop and O'Bannon refused to fill out the questionnaire, and were suspended for two days. Upon threat of discharge, these four employees filled out the questionnaire.

The Board found that in order for the questioning of employees to be held valid, their participation must be on a voluntary basis. The Board held that the threat of discharge coerced and restrained the employees in their right to engage in protected concerted activity in violation of Section 8(a) (1) of the Act.

 An employer may question his employees in preparation for a Board hearing, but is limited to questions relevant to the charges of unfair labor practices. In balancing the right of the employer to prepare his defense against the risk of intimidation which interrogation as to Union matters generally entails, the Court said in Texas Industries, Inc. v. National Labor Relations Board, 336 F.2d 128, 133 (C.A.5, 1964):

"Any interrogation by the employer relating to union matters presents an ever present danger of coercing employees in violation of their § 7 rights. On the other hand, fairness to the employer dictates that he be given a reasonable opportunity to prepare his defense. Accommodation of these interests requires that the scope and manner of permissible questioning be strictly confined to the necessities of trial preparation. We hold that by interrogating its employees as to the contents of statements given to Board agents, and by seeking copies of these statements, the company exceeded these limits and thereby violated § 8 (a) (1)."

This Court has held that interrogating employees as to the contents of statements given to Board agents infringes upon employee's Section 7 rights to invoke and participate in Board proceedings and is prohibited by Section 8(a) (1) of the Act. Surprenant Manufacturing Co. v. National Labor Relations Board, 341 F.2d 756, (C.A.6, 1965); National Labor Relations Board v. Winn-Dixie Stores, Inc., 341 F.2d 750, (C.A.6, 1965). In Surprenant Manufacturing Co. v. National Labor Relations Board, supra, quoting with approval Texas Industries, Inc. v. National Labor Relations Board, this Court said:

"The employee will be understandably reluctant to reveal information prejudicial to his employer when the employer can easily find out that he has done so. No employee will want to risk forfeiting the goodwill of his superiors, thereby lessening his job security and promotion opportunities. It is no answer to say that the employee is free to refuse to furnish his employer with a copy of his statement. A refusal under such circumstances would be tantamount to an admission that the statement contained matter which the employee wished to conceal from the employer. In order to assure vindication of employee rights under the Act, it is essential that the Board be able to conduct ef-

fective investigations and secure supporting statements from employees. We feel that preserving the confidentiality of employee statements is conducive to this end."

However, the Board has held that while the employer may not prior to the hearing, ask for a copy of a statement given to the Board, the employer may ask if the employee has given a statement to the Board. Montgomery Ward & Company, 146 NLRB No. 1, National Labor Relations Board v. Winn-Dixie Stores, Inc., supra. In *Montgomery Ward*, supra, the Board held that the purpose of the questionnaire was to "obtain information for use as the basis for a proper demand for such affidavit, to which the Respondent would be entitled in the event the person queried" appeared as a witness against it in the Board proceeding. The Board found the information "clearly relevant and necessary".

In National Labor Relations Board v. Winn-Dixie Stores, Inc., supra, this Court said:

"It is to be emphasized that the Board recognized, as do we, that the respondents had the right to 'interview employees for the purpose of discovering facts within the limits of the issues raised by a complaint, where the employer, or its counsel does so for the purpose of preparing its case for trial and does not go beyond the necessities of such preparation to pry into matters of union membership, to discuss the nature or extent of union activity, to dissuade employees from joining or remaining members of a union, or otherwise to interfere with the statutory right of self-organization.' "

Here the Board found that while the questionnaire did not go beyond the issues raised by the complaint, the threat of, and actual suspension of several employees violated Section 8(a) (1) of the Act. The Board found that questioning must occur in a context free from employer hostility, must not be itself coercive, and that employee participation must be obtained on a voluntary basis.

Johnnie's Poultry Co., 146 NLRB No. 770. The reversal of this case by the Eighth Circuit, 344 F.2d 617 (1965) has not been regarded as a rejection of these principles. See National Labor Relations Board v. Neuhoff Bros., Packers, Inc. (C.A.5, decided March 23, 1967, Case No. 23330) 375 F.2d 372.

In Retail Clerks International Association, AFL–CIO v. National Labor Relations Board, Respondent, Montgomery Ward & Co., Inc., Intervenor, (Court of Appeals, District of Columbia, decided January 6, 1967, Case No. 19766) 373 F.2d 655, the Court upheld the Board's finding that the threat of discharge for refusing to answer a questionnaire was unlawful coercion and would have a chilling effect on an employee's exercise of his Section 7 rights.

The Board, in its expertise, is best able to gauge whether the employer's threat of discharge for failure to answer a questionnaire inhibits employees from invoking or participating in effective Board proceedings. We find there was substantial evidence to support the Board's finding, and Order that the employer cease from threatening employees with suspension and discharge for refusing to answer the questionnaire.

3. The Layoff and Discharge Cases.

### A. Margaret Bishop and Clara O'Bannon.

The Company used several telephone operators whose duties were to wait on customers who came into the store, and to receive and write up incoming telephone orders. The Company also used four women as promotional operators. The promotional operators were to promote business by calling catalog customers to solicit sales. The promotional operators were not to take incoming calls unless the customer asked for a specific promotional girl.

When the promotional operator called a customer and the call resulted in a sale, the information was to be included on a promotional sheet. The promotional operators were instructed not to in-

clude incoming calls on the promotional sheet.

The only other time a telephone operator was permitted to refer an incoming call to a promotional operator was when the telephone operator was too busy taking care of another customer. Generally, the telephone operator was instructed to ask the customer if she could call back. If the customer could not wait, and the telephone operator could not talk to the customer, the call was given to a promotional operator.

Mrs. Bishop was hired as a promotional operator. She was to call customers whose last names began with the letters R–Z. All the promotional girls had a quota of $108.00 per day. They were paid a salary but were told that if they did not make their quota, they would lose their job. Mrs. Bishop's work was appraised in July by Mr. Frazier. She was told if she did not improve, she would be discharged before the next appraisal. In the latter part of September, the four promotional operators were told they would have to make their quotas or be released. The month prior, Mrs. Bishop had averaged $87. per day. Only one other employee failed to make her quota for the previous month. She had only worked on the job for twenty-one days.

After this, Mrs. Bishop's sales increased. However, Mrs. O'Bannon was giving many calls to Mrs. Bishop even though the customers did not ask for Mrs. Bishop. One day, four out of six orders resulted in calls being referred by Mrs. O'Bannon to Mrs. Bishop. Two of the six customers' names were not on Mrs. Bishop's promotional cards. Neither employee denied these referrals.

Mrs. Swindall, a promotional operator and a member of the Union, testified that Mrs. O'Bannon received a call from a Mrs. Post. Mrs. Post asked for Mrs. Swindall, was told Mrs. Swindall was not in, and the call was given to Mrs. Bishop. Mrs. Swindall was available when Mrs. Post called. Mrs. Swindall also testified they were not to take any incoming calls as promotional operators unless specifically asked for.

### B. Ruby Wright.

Mrs. Wright was a telephone operator and was told that beginning September 8th, she would substitute for Mrs. Bishop. Mrs. Bishop was a promotional operator. The only extra duty Mrs. Wright was given was to call the answering service. During the hours the store was closed, customers could place telephone orders with the answering service. Mrs. Bishop would call the store and secure the orders from the answering service. Mrs. Wright began work at 10:00 a. m. The answering service called at 10:30 a. m. Mrs. Wright told the answering service she was busy and that she would call back soon. The answering service called again at 11:45 a. m. and Mrs. Wright said she did not have any order blanks. The answering service called back again at 2:00 p. m. and 3:30 p. m. and Mrs. Wright again said she was too busy. The orders were finally placed at five o'clock. Mrs. Wright testified she called the answering service, but they were too busy to give her the orders. The answering service had no record of any call from the Company on that day. The answering service made a record of all calls.

Mr. Frazier, after determining that only one of the orders had been placed, terminated Mrs. Wright's employment.

### C. Elaine McCandless and Norma Milby.

Prior to the spring of 1964, each catalog store performed its own credit work. The Company employed Mrs. Underwood and Mrs. Allgood in the credit department. Early in 1964, all credit operations were to be centralized in Chicago. As a result of closing the credit department, Mr. Frazier reduced his staff by laying off Mrs. McCandless and Mrs. Milby. Mrs. Underwood and Mrs. Allgood had seniority dating from October 7, 1963. Mrs. McCandless' seniority dated from October 10, 1963 and Mrs. Milby from April, 1964. While the Company did not have a seniority system, it

did take this into account in laying off two employees. Only one employee junior to Mrs. Milby was on the payroll and she was a part-time employee. The Company also took into account the availability of the employees. Mrs. Milby was not able to work after 3:30 p. m. in the afternoon or on Saturday. Mrs. McCandless could not work after 5:30 p. m. and could not work on Saturday. The Company maintained they could not work their available time into any other job being done at the store at the time of the layoffs.

### D. Mildred Robinson.

As cash report clerk, Mrs. Robinson's duties were to make the daily bank deposit, create disbursement vouchers, disburse payroll, prepare time cards, calculate hours and maintain personnel records. An audit of the store in July, 1965, showed many irregularities in Mrs. Robinson's work. Consequently, a manager came from Chicago to help Mrs. Robinson and other employees. Mrs. Robinson continued to make mistakes. After her return from her suspension for failing to answer the questionnaire, Mrs. Robinson was offered a choice of two positions. Mr. Frazier told her "we have to have one who is for the Company, someone that we can trust". Mrs. Robinson refused to take either position and quit because she had given Wards her best and she was hurt at what Mr. Frazier said. She also said she could not take the pressure.

The Board rejected the business motives for the layoffs and the discharges. Its decision is based entirely on inferences. The entire record must be reviewed, and overbearing evidence calling for contrary inferences must be considered. Universal Camera Corp. v. National Labor Relations Board, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

■■ Union activity is no bar to a discharge where the discharge is for sound business reasons. Here in fact the Company was informed that the Union represented its employees, and that employees Robinson, Milby, Bishop, Mc-Candless, Wright, and Swindall were members of the organizing committee. While this was effective in putting the Company on notice as to the employees who were organizing the Union, this was not effective to insulate these employees from loss of their jobs for business reasons. However, if discouragement of Union membership is a substantial, motivating reason for the discharge, the existence of an alternate ground of justification is no defense. National Labor Relations Board v. Lexington Chair Co., 361 F.2d 283 (C.A.4, 1966).

■ Where a group of employees active in the Union are discharged, there is a permissible inference of discrimination based on the percentage of discharged employees engaged in Union activities. National Labor Relations Board v. Ambox, Inc., 357 F.2d 138 (C.A.5, 1966); National Labor Relations Board v. Camco, Inc., 340 F.2d 803 (C.A.5, 1965). In the latter case, eleven of sixteen Union adherents were discharged. Not one of 74 non-union emloyees were discharged.

However, in group discharges, the percentage inference may be overcome by strong evidence that there was cause for the discharge. National Labor Relations Board v. Newton Co., 236 F.2d 438, (C.A. 5, 1956). Here such evidence was presented.

The record is clear that Mrs. Bishop and Mrs. O'Bannon had been told and warned that incoming calls should not be referred to a promotional operator unless that operator was specifically asked for by the customer. Mrs. Swindall, a Union organizer affirmed this fact. Mrs. Swindall also testified, that shortly before these two employees were discharged, Mrs. O'Bannon referred a Mrs. Post to Mrs. Bishop after Mrs. Post had specifically asked for Mrs. Swindall. While these two employees maintained this procedure was not regularly followed, there is nothing in the record to substantiate this after the promotional operators were told in the September meeting that they were only to call their catalog customers, and Mrs. Bishop was

warned that she would have to make her quota or be discharged.

■ The evidence cannot support the finding that Mrs. Robinson was constructively discharged. An employee is constructively discharged when the employer makes working conditions so unbearable because of the employee's Union activity or demotes an employee because of Union activity and the employee is thus induced or forced to resign. See 2 C.C.H. Labor Law Reporter, Paragraph 4075. A clear expression of dissatisfaction without a threat of retribution is not a constructive discharge when the employee resigns. In re Holmes Company, 81 NLRB 753 (1949). Nor is there a constructive discharge when the employee's resignation results from his own poor workmanship. In re Barkers East Main Corp., 136 NLRB 494 (1962).

Mrs. Robinson was not discharged. She was told her work was not satisfactory. She was offered two other positions at the same rate of pay. We cannot find from this evidence that Mrs. Robinson was constructively discharged.

The record shows that Mrs. Wright was discharged for not only failing to promptly call the answering service, but also for her failure to complete and process the orders she finally received from the answering service.

The decision to centralize all credit operations in Chicago was reached prior to the organizational activities of the Union. The Company was then required to lay off two employees. Mrs. McCandless and Mrs. Milby were chosen because they had less seniority than Mrs. Underwood and Mrs. Allgood who worked in the credit department, and less seniority than the other employees except a part-time worker. Additionally, these two employees did not have the flexibility in the hours they could work as did the other employees. Again, the Company demonstrated the legitimate business reasons for these two layoffs.

■ Considering the entire record, we find there was compelling and substantial business reason for the layoffs and discharges of the six employees.

The Board also found that the Company refused to bargain with the Union in violation of Section 8(a) (5) and (1) of the Act. On April 22nd the Union sent a telegram to the Company stating that the Union represented a majority of its employees and requested recognition. Before the Company responded, the Union filed a representation petition with the Board on April 24th. About a week later, the Company advised the Union that it doubted the Union's majority status. The parties then agreed to a consent election to be held on June 12th. Because of the unfair labor practice charges filed herein, the election was never held.

■ An employer may have a good faith doubt as to the Union's majority even though the employer was found guilty of an unfair labor practice in connection with the Union's organizational campaign. Edward Fields, Inc. v. National Labor Relations Board, 325 F.2d 754 (C.A.2, 1963); National Labor Relations Board v. Dan River Mills, Inc., 274 F.2d 381 (C.A.5, 1960); National Labor Relations Board v. Hannaford Bros. Co., 261 F.2d 638 (C.A.1, 1959).

In National Labor Relations Board v. Dan River Mills, Inc., supra, the Union filed a representation petition before the Union's letter demanding recognition could be acknowledged by the employer. The Court said:

"[I]t was reasonable for the Employer to assume that the law would resolve its good faith doubt concerning the Union's majority by the election requested and shortly ordered. The subsequent dismissal of those proceedings with the filing of the unfair labor complaint cannot deprive its interim actions of that cloak of reasonableness and good faith doubt."

■ We do not find that the Company violated Section 8(a) (5) in its refusal to bargain with the Union.

The Board's order finding the Company violated Section 8(a) (1) of the

Act by coercively interrogating its employees and by threatening to suspend, and in fact suspending four employees for refusing to answer a Company questionnaire is enforced. Enforcement of the Board's order finding the Company violated Section 8(a) (3) and (1) of the Act by its layoffs and discharges and the violation of Section 8(a) (5) and (1) of the Act by refusing to bargain with the Union is denied.