416 F.Supp. 972 (1976)
Larry THOMPSON, Plaintiff,
v.
McDONNELL DOUGLAS CORP., Defendant.
No. 74-454 C (1).
United States District Court, E. D. Missouri, E. D.
June 25, 1976.
*973 *974 *975 Louis Gilden, St. Louis, Mo., for plaintiff.
Francis M. Gaffney, Bryan, Cave, McPheeters & McRoberts, St. Louis, Mo., for defendant.

FINDINGS OF FACT AND CONCLUSIONS OF LAW
MEREDITH, Chief Judge.
Plaintiff Larry Thompson brought this action pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., and 42 U.S.C. § 1981, alleging racial discrimination in employment.
This matter was tried to the Court without a jury. The Court has been duly informed by briefs, exhibits, depositions, and testimony.

Findings of Fact
1. The plaintiff, Larry Thompson, is a black male citizen of the United States and a resident of the State of Missouri.
2. The defendant, McDonnell Douglas Corporation (hereinafter "McDonnell"), is a corporation organized and existing under and by virtue of law. McDonnell is an employer, is engaged in an industry affecting commerce, and employs at least twenty-five persons.
3. Plaintiff was hired by defendant McDonnell on or about July 6, 1966, as a T.D.P.M. Operator A in Department 676, defendant's scientific computer operations department. Plaintiff worked in Department 676 until he was transferred to Department 674, defendant's business or administrative computer operations department, on May 10, 1971. Plaintiff worked in Department 674 until he resigned his employment with defendant McDonnell on or about February 25, 1972.
4. Plaintiff served in the Marine Corps from January 20, 1960, to May 19, 1966, a period of six years and four months. He took IBM data processing courses of three week's duration through the Marine Corps. He worked in the Data Processing Department of the Marine Corps at Station El Toro, California, from July 1962 to May 10, 1966, at which time he was honorably discharged.
*976 5. Plaintiff graduated from Vashon High School and attended Harris Teachers College and O'Fallon Technical School prior to his service with the Marine Corps.
6. In December 1966, plaintiff expressed his desire to go into business or administrative programming and to become a programmer trainee to Luke Abkemeier, plaintiff's supervisor in Department 676, and to Gary Bayer, a section manager in the administrative programming area.
7. Plaintiff was advised by Mr. Bayer that the qualifications for an administrative programmer were a college degree, programming experience, or essential system knowledge, and that a favorable recommendation from operations supervision and an above-average work performance record were necessary for transfer into the programmer trainee classification. Mr. Bayer advised plaintiff that he continue his college work toward the attainment of an Associate of Arts degree, and continue on with a four-year degree program. Mr. Bayer further advised plaintiff that if he were interested in becoming an administrative programmer, he should transfer into the administrative computer operations department rather than remain in the scientific operations department.
8. Mr. Abkemeier also advised plaintiff to transfer into the administrative programming department.
9. Despite the recommendations of Mr. Bayer and Mr. Abkemeier that plaintiff transfer into the administrative operations department in order to further his career goal of becoming an administrative programmer, plaintiff made no attempt to do so during his six years of employment with defendant.
10. Plaintiff enrolled at Forest Park Community College for the spring semester of 1969, and obtained his Associate of Arts Degree on June 7, 1971. Subsequent to his resignation from defendant McDonnell, plaintiff enrolled in the night school at Washington University and obtained his Bachelor of Science Degree in Business Administration on May 23, 1975.
11. During his employment at McDonnell, plaintiff worked on the first shift until on or about December 19, 1966; then on the third shift until on or about June 26, 1967; then on the second shift until on or about January 4, 1971; then on the first shift until on or about May 10, 1971, all in Department 676. Defendant was transferred to Department 674 on or about May 10, 1971, where he worked on the first shift until his termination.
12. Sometime in the middle to late fall of 1970, plaintiff made a complaint to Luther Bellinger, Corporate Director of Equal Opportunity, that he was being paid a lower salary than a female caucasian computer operator (Geraldine Orso) in his department. Mr. Bellinger is black. At the time plaintiff and Ms. Orso were the only operators on duty during the second shift and performed the same duties with a minimum of supervision. At the time, plaintiff also complained that one of the male caucasian operators in his department was being paid unfairly.
13. Plaintiff expressed to Mr. Bellinger and to Tom Nelson, Equal Employment Co-ordinator for the McDonnell Aircraft Division of defendant, that his primary concern was upward mobility to programmer trainee and that he did not want to sue for the pay difference as long as he could be promoted. Mr. Nelson is also black.
14. Mr. Nelson made preliminary findings and recommendations that plaintiff's merit increases were unjustifiably below those of other comparable employees and should be brought into line. Mr. Nelson also advised his superiors that plaintiff would probably file a formal discrimination complaint based on pay.
15. After further investigation of plaintiff's charges concerning pay discrepancies, defendant determined that any pay differences were justified and notified plaintiff of this fact sometime in December of 1970.
16. Although plaintiff's complaint did not result in a pay increase to bring his wages to the level of Ms. Orso's, plaintiff was assigned a full-time counselor to assist him with his career goals, and his working *977 hours were rescheduled to the first shift to better enable him to complete his education. Numerous counseling sessions were held with plaintiff with respect to his career and personal problems.
17. A comparison of plaintiff's personnel file with that of Ms. Orso indicates that Ms. Orso had received above-average and outstanding evaluations of her work performance, whereas plaintiff was rated average. The two employees' files also reveal that Ms. Orso had two years of college prior to her employment with defendant, and that she had been employed with defendant four years longer than plaintiff, although she was employed in a different capacity during those four years.
18. The evidence, including the testimony of plaintiff's supervisor, Mr. Abkemeier, and his co-worker, Ms. Orso, indicates that the primary reason for plaintiff's poor performance rating was his frequent absences from his job area during working hours, and the resulting shift of the burden of plaintiff's work during his absences to Ms. Orso. The absences ranged from a few minutes to three or four hours and occurred approximately three times a week.
19. Plaintiff's absences from the work area tended to occur during the latter half of his shift, rather than the first half, so that his absences were not attributable to the counseling sessions he had with first shift personnel.
20. The majority of plaintiff's absences from the job area were not attributable to periods of computer breakdowns, since such breakdowns were relatively infrequent.
21. A group award for outstanding teamwork on a special project received by plaintiff, Ms. Orso, and fourteen other employees in July 1969 has no bearing on plaintiff's charge of discriminatory pay.
22. Employees were evaluated once every six months by means of a performance rating form. The employee's immediate supervisor rated the employee as outstanding, above average, average, borderline-acceptable, or unsatisfactory in each of the following categories: work output, work quality, work knowledge, work habits, work interest, resourcefulness, attendance, relationships, and general evaluation. Employees were given an overall rating computed from their ratings in each of the above categories. The evaluations were discussed with the employee and then approved by two department managers.
23. In 1966, plaintiff was called in about his failure to list on his application an arrest relating to a charge of contributing to the delinquency of a minor and investigation of suspicion of statutory rape which occurred on July 5, 1959. Plaintiff explained that he failed to list the arrest through an oversight. Plaintiff's supervisor, Mr. Luke Abkemeier, was advised of these facts. Mr. Abkemeier stated that plaintiff was doing an excellent job, and that absenteeism was no problem. Plaintiff was cautioned that he could have been terminated because of his omission.
24. Plaintiff was never harassed or reprimanded by defendant for any relationships which he might have had with white women.
25. On Friday, April 30, 1971, plaintiff and Virginia Stafford, a clerk in Department 676, had a conversation at about 4:00 p. m., near the end of the first shift.
26. On Monday, May 3, 1971, Ms. Stafford reported the substance of Friday's conversation with plaintiff to the department supervisor, Mr. Abkemeier. She told Mr. Abkemeier that plaintiff, using profane and obscene language, expressed his anger over the firing of a black receptionist in another department; told Ms. Stafford of his meeting with Mr. Abkemeier regarding his charges of pay discrimination earlier that week; told her that he had told Mr. Abkemeier of his sexual experiences with women of various races; and told her that he had told Mr. Abkemeier that if anything happened to his job, plaintiff would be at Mr. Abkemeier's home having sexual intercourse with Mr. Abkemeier's wife.
27. Mr. Abkemeier did not confront plaintiff to ascertain plaintiff's version of the conversation, but wrote up Ms. Stafford's allegations in an "Employee Incident *978 Report" and forwarded the report to his supervisor, Mr. Nate Gianino.
28. On Wednesday, May 5, 1971, plaintiff was called into the office of Mr. Luther Bellinger, Corporate Director of Equal Opportunity. Also present was Mr. Neal Dohr, Manager of Administrative Services for defendant. Plaintiff was asked by these two men if the report were true. Plaintiff acknowledged that the conversation had taken place, but denied making any comments about his sexual experiences or threats regarding his supervisor's wife.
29. Mr. Bellinger and Mr. Dohr, together with other supervisory personnel, and after a suitable investigation, accepted Ms. Stafford's version of the incident, and decided that plaintiff should receive a lateral transfer to the administrative operations department with no reduction in pay or in seniority. Plaintiff was transferred to Department 674 on May 10, 1971, and warned that any recurrence of such disruptive conduct would bring dismissal.
30. The reasons for the transfer were to avoid obvious personnel conflicts resulting from the Stafford incident; to eliminate the possibility of those conflicts prejudicing plaintiff's chances for advancement; and to enable plaintiff to become familiar with the administrative area of computer operations as preparation for possible transfer into the administrative programming area.
31. Mr. Dohr, in an affidavit given to the EEOC, stated that plaintiff was being transferred in order to avoid any possibility of prejudice to plaintiff arising out of the Stafford incident. Mr. Dohr also stated in the affidavit that defendant was being transferred from Department 676, where he was the only black, to Department 674, where there were more blacks, so that he would not be in competition with just whites.
32. Although Mr. Charles Hoffman, plaintiff's new section manager in Department 674, was told about the Stafford incident, neither plaintiff's immediate supervisor nor anyone else in Department 674 was told of the reasons for plaintiff's transfer into that department.
33. The testimony of plaintiff's expert witness, Dr. Phillip Dennis, characterizing Luke Abkemeier, Luther Bellinger, and Neal Dohr as racists in their reactions to the Stafford incident, is not persuasive. Dr. Dennis' testimony was based only upon the employee incident report and unspecified excerpts from Mr. Abkemeier's deposition reviewed by the witness prior to trial. The witness had no personal meetings with any of the above-mentioned individuals.
34. In June of 1971, plaintiff presented his Associate of Arts Degree to Mr. Dohr and asked to be transferred into the position of programmer trainee.
35. No one in a supervisory capacity ever promised plaintiff that he would be promoted to programmer trainee upon completion of his Associate of Arts degree, but only that he would be considered for promotion, if certain other qualifications were met, including acceptance by the programming area through interviews and acceptance from his current supervision. Plaintiff had also been advised that promotion into the programmer trainee classification was dependent on openings in the programming area at the time.
36. Twenty-one persons transferred from computer operator to programmer trainee during the period plaintiff was employed by defendant. One of these twenty-one persons was black.
37. Of the twenty-one transferees, all except two had either an Associate of Arts degree in data processing or two years of college or more. The two individuals lacking in college background went into the programmer training classification either before or near the beginning of plaintiff's employment with defendant and had a great deal of experience as computer operators.
38. All of the twenty-one transferees had work performance records of above average or outstanding.
39. Four white employees were denied transfer into the programmer trainee classification during the period of plaintiff's employment. *979 All had performance ratings equal to or better than that of plaintiff.
40. Plaintiff was not recommended to the programming department for a position as a computer programmer trainee from May 1971 to the time of his termination because his job performance in Department 674 was not above average or outstanding. His average rating again was due primarily to his frequent absences from the job area during working hours.
41. Plaintiff was not denied promotion either because of his prior claim of discriminatory pay or because of the Stafford incident.
42. There is no evidence that there were any openings available within the programming trainee position which were filled by either whites or blacks equally or less qualified than plaintiff during the period after plaintiff received his degree until his resignation.
43. Shortly before plaintiff voluntarily tendered his resignation to defendant, he was encouraged by defendant to remain because of his tenure and was told that if his work performance and job habits improved, he would again be considered for the programmer trainee position in six months.
44. There is no evidence that plaintiff was either harassed or intimidated or slated for termination or layoff in his job as a computer operator in Department 674. On the contrary, defendant made exceptional efforts to assist plaintiff in achieving his career goal to become a computer programmer.
45. An IBM Aptitude Test for Programming Personnel was given to applicants for programmer trainee during the period of plaintiff's employment. Plaintiff made an acceptable score on the test, as did the other successful black applicant for transfer.
46. During the period of plaintiff's employment, 1966 to 1972, 444 persons were hired into the programmer trainee classification, twelve of whom were black, representing 2.7% black hirees. The census for the St. Louis Standard Metropolitan Statistical Area reflects 16.4% minority.
47. Plaintiff had contacts with Mr. Jesse Anderson of the Equitable Life Assurance Company prior to his resignation concerning the job he began with Equitable four days after his resignation.
48. Plaintiff resigned his employment with McDonnell on or about February 25, 1972.
49. Plaintiff filed charges of racial discrimination with the Equal Employment Opportunity Commission on February 8, 1972, and March 8, 1972.
50. The charges were deferred to the Missouri Commission on Human Rights on March 14, 1972.
51. On November 28, 1972, the EEOC made a reasonable cause finding of discrimination against defendant, and on June 10, 1974, a Notice of Right to Sue Within 90 Days was issued to plaintiff.
52. Plaintiff filed suit on July 1, 1974.

Conclusions of Law
1. This Court has jurisdiction of the parties and of plaintiff's claims of constructive discharge and failure to promote under 42 U.S.C. § 2000e-5(f)(3) and 28 U.S.C. § 1343.
2. This Court has jurisdiction of plaintiff's claims of discriminatory pay and transfer only under 28 U.S.C. § 1343, since a timely charge regarding these allegations was not filed with the EEOC, as required by 42 U.S.C. § 2000e-5(e).
3. Defendant McDonnell is an employer within the meaning of 42 U.S.C. § 2000e(b).
4. Plaintiff in this action alleges that defendant, in violation of 42 U.S.C. § 2000e, et seq., and § 1981, reprimanded and transferred plaintiff to another department because of his race; maintained segregated job classifications on the basis of race; refused to promote plaintiff because of his race; retaliated against plaintiff for opposing discriminatory pay practices made unlawful by Title VII; and constructively discharged plaintiff because of his race.
*980 5. This Court concludes that plaintiff has failed to establish that defendant has discriminated against him in employment because of his race.
6. In order to establish a prima facie case of discrimination, thereby shifting the burden to defendant to justify the challenged action or practice by showing its legitimate business necessity, it is necessary for plaintiff to show that he belongs to a racial minority, that he applied for and was qualified for a job opening, that he was rejected, and that the employer continued to seek applications for the opening. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In the case of a failure to promote, it has been held that a prima facie case can also be made by showing
". . . (i) that plaintiff belongs to a racial minority, (ii) that he was qualified for promotion and might have reasonably expected selection for promotion under the defendant's on-going competitive promotion system, (iii) that he was not promoted, and (iv) the supervisory level employees having responsibility to exercise judgment under the promotion system betrayed in other matters a predisposition towards discrimination against members of the involved minority." Pettit v. United States, 488 F.2d 1026, 1033, 203 Ct.Cl. 207 (1973).
See Taylor v. Safeway Stores, Inc., 365 F.Supp. 468 (D.Colo.1973). Statistics may also be used to support an individual claim of discrimination. McDonnell Douglas Corp. v. Green, supra. However, statistics are not ". . . a determinative factor in an individual, as opposed to a class action." Harper v. Trans World Airlines, Inc., 525 F.2d 409, 412 (8th Cir. 1975).
7. The Eighth Circuit in Green v. Missouri Pacific R.R., 523 F.2d 1290 (8th Cir. 1975), outlines three ways in which a disproportionate racial impact may be established through the use of statistics: (i) a showing that ". . . blacks as a class (or at least blacks in a specified geographical area) are excluded by the employment practice in question at a substantially higher rate than white . . .;" (ii) ". . . a comparison of the percentage of black and white job applicants actually excluded by the employment practice or test of the particular company or governmental agency in question . . .;" and (iii) a comparison of ". . . the level of employment of blacks by the company or governmental agency . . . [with] the percentage of blacks in the relevant geographical area." 523 F.2d at 1293-94.
8. Plaintiff has not attempted to make a general comparison of the number of blacks employed by McDonnell with the percentage of blacks in the relevant area, in accordance with the third test set forth in Green v. Missouri Pacific R.R., supra. He has attempted to show a general pattern or policy of discrimination by evidence of the number of blacks and whites hired from the outside into the programmer trainee classification during the period of his employment. Plaintiff has shown that out of a total of 444 new hirees into the programmer trainee classification during the 1966 to 1972 period, only 2.7% were nonwhite, as compared with a 16.4% nonwhite population in the St. Louis Standard Metropolitan Statistical Area.
These statistics are inconclusive. A statistical disparity between the number of blacks hired and the number of blacks in the relevant geographical area is meaningful only when the number of blacks hired is compared with the number of blacks in the relevant labor market, i. e., the number of blacks in the relevant area who possess the minimal qualifications for the job. See United States v. Hazelwood School District, 534 F.2d 805 (8th Cir. 1976); Green v. McDonnell Douglas Corp., 528 F.2d 1102 (8th Cir. 1976). The position in question here is not an entry-level job requiring no formal education, but a highly skilled and technical job. Although plaintiff challenges the requirement of a collegiate degree for the position, he does not challenge the common sense observation that an applicant for a programming trainee position must have some familiarity with computer operations, and, in fact, bases his own claim *981 on the argument that he was qualified to become a programmer trainee by virtue of his technical training and experience as a computer operator. Plaintiff has presented no evidence as to the number of blacks in the relevant geographical area with at least these minimal qualifications.
9. The first and second methods of statistical proof outlined in Green v. Missouri Pacific R.R., supra, relate directly to the challenged job criteria, the first method by showing the effect of the criteria on blacks as a class, and the second by showing the effect of the criteria on actual applicants for the position in question. In this action, plaintiff is challenging three criteria which were applied to applicants for the programmer trainee classification during the period of his employment: the educational requirement of an Associate of Arts degree; an IBM programmer aptitude test; and defendant's system of evaluation of employee performance by supervisory personnel. It is obvious that different criteria were applied to outside hirees and inside transferees into the position of programmer trainee, since the employee evaluation requirement is relevant only to transferees. Because of this difference, the relevance to plaintiff's claim of any statistics regarding outside hirees is questionable.
10. Plaintiff has presented no statistical evidence as to the effect of the educational requirement and aptitude test upon blacks as a class. The Court notes that plaintiff met both of these requirements.
11. Plaintiff's proof regarding the effects of the challenged practices on applicants for programmer trainee is unpersuasive.
(a) The evidence shows that of the total number of applicants for transfer during the period of 1966 to 1972, one of the two blacks and twenty of the twenty-four whites who applied were transferred. Although these figures show that only fifty percent of the blacks who applied were transferred, as compared with eighty-three percent of the whites, statistical evidence derived from such a small universe ". . has little predictive value and must be disregarded." Harper v. Trans World Airlines, Inc., supra, 525 F.2d at 412. Accord, Robinson v. City of Dallas, 514 F.2d 1271 (5th Cir. 1975).
(b) Although plaintiff does not present any evidence of the percentage of new hirees as compared to applicants of both races during the entire period of his employment, he does attempt to make such a comparison for the period of February 26, 1971, through December 31, 1972. This latter time period encompasses but exceeds the period during which plaintiff, by virtue of his Associate of Arts degree, was qualified for transfer. The figures so adduced are as follows: out of 197 applicants, 61 persons were hired, 1 black, representing 1.5% of the total number of black applicants, and 60 whites, representing 45% of the total number of white applicants. As noted above, the Court questions the relevancy of these statistics, because of the different criteria applied to hirees and transferees. Even if relevant, the figures are incomplete and not reliable since new college graduates were not included in the number of applicants. Since some collegiate education was a requirement for the position, the absence of these figures must have a considerable effect on the accuracy of the statistics. The Court notes that during the same period of 1971 and 1972, one of two black applicants for transfer and one of two white applicants for transfer were promoted into the programmer trainee classification.
12. Plaintiff has not established a prima facie case under Pettit v. United States, supra, since he has not established that his supervisors displayed a predisposition toward discrimination against blacks on other matters. Plaintiff has failed to prove a prima facie case under Green v. McDonnell Douglas Corp., supra, since he has failed to show that he was qualified for promotion under defendant's criteria. Defendant has shown that only employees with above-average or outstanding performance ratings were eligible for promotion into the programmer trainee classification. Plaintiff did not achieve the necessary performance rating.
*982 13. Even if plaintiff had made a prima facie case of discrimination, defendant has sufficiently rebutted plaintiff's charges, and plaintiff has not shown that defendant's justifications for its actions were a pretext. Green v. McDonnell Douglas Corp., supra.
14. Both plaintiff's charge of failure to promote and his charge of discriminatory pay discrepancies are based in part on his challenge to defendant's system of employee evaluation as impermissibly subjective. The Courts have looked with disfavor on promotional systems which are dependent on the subjective evaluation of employees by supervisory personnel. Rogers v. International Paper Co., 510 F.2d 1340 (8th Cir.) vacated on other grounds, 423 U.S. 809, 96 S.Ct. 19, 46 L.Ed.2d 29 (1975), reinstated, with modification on other grounds, 526 F.2d 722 (8th Cir. 1975); United States v. N. L. Industries, 479 F.2d 354 (8th Cir. 1973); Rowe v. General Motors Corp., 457 F.2d 348 (5th Cir. 1972). However, as stated by the Court in Rogers, supra, at 1345, subjective promotion criteria
". . . are not to be condemned as unlawful per se, for in all fairness to applicants and employers alike, decisions about . . . promotion . . . cannot realistically be made using objective standards alone."
Although defendant's performance rating sheets contain subjective, as well as objective, factors, their use is much more circumscribed than the subjective practices condemned in the above cases, since the criteria are written, the ratings are discussed with the employee, who may register a complaint with the corporation's equal opportunity officers if he or she thinks the rating unfair, and the ratings are reviewed by at least two other supervisors.
15. Of greater significance in this case, there has been no showing that defendant discriminated among employees in applying these criteria. On the contrary, defendant has shown that another black operator was promoted to programmer trainee prior to plaintiff's request for transfer, based in part on his outstanding performance ratings. In addition, defendant has shown that it did not rely only on the subjective evaluations of plaintiff's immediate supervisor, but has presented testimony from plaintiff's co-worker, Ms. Orso, and several other supervisors, that plaintiff's low ratings were due primarily to the fact of his frequent absences from the job area during working hours.
16. No discriminatory pay discrepancies existed with respect to plaintiff's rate of pay compared to other computer operators of which he complained. Ms. Orso consistently achieved better performance ratings than plaintiff, and, as noted above, there was sufficient testimony from Ms. Orso and others to convince the Court that plaintiff's absence from the job area during working hours, and the concomitant shift of the burden of the work to Ms. Orso, justified the difference in the amount of the merit increases given to the two employees. Since other employees in plaintiff's department were either in a supervisory capacity or making less than plaintiff, there can be no grounds for a claim of discriminatory pay.
17. The employee incident report received by plaintiff on May 5, 1971, and his subsequent transfer into Department 674 were not the result of racial discrimination against plaintiff or in retaliation for his prior charge of discriminatory pay. Although one person who had a part in the decision made a statement to the EEOC which indicated that impermissible racial considerations entered into his decision, the preponderance of the evidence shows that the transfer was made for legitimate business needs: to avoid obvious personnel conflicts caused by plaintiff's behavior in the Stafford incident; to eliminate the possibility of those conflicts prejudicing plaintiff's chances for advancement; and to enable plaintiff to become familiar with the administrative area of computer operations as preparation for possible transfer into the administrative programming area.
18. Even if the transfer were found to be discriminatory, plaintiff would *983 have no damage since the transfer was lateral without any reduction in pay or seniority, and since it admittedly improved plaintiff's chances to advance into administrative programming, which was plaintiff's expressed desire.
19. Plaintiff was not denied promotion for discriminatory reasons or in retaliation for his charges of pay discrimination. Plaintiff was not qualified compared to other computer operators, both black and white, who were transferred from the operations to the programming area, and was not as well qualified as other white computer operators who were refused transfer. Plaintiff remained eligible for promotion. Thus, plaintiff's situation is distinguishable from that of the plaintiff in Marquez v. Omaha District Sales Office, Ford Division, 440 F.2d 1157 (8th Cir. 1971). In Marquez, the plaintiff had remained in the same job classification for fifteen years, while less qualified employees were promoted over him; had received consistently excellent ratings from his supervisors; and had been removed from the promotable list for no apparent reason.
20. Plaintiff's challenge to the IBM Aptitude Test for Programming Personnel given to applicants for programmer trainee is without merit since he has presented no evidence that the testing had a disparate effect on the hiring of blacks into the computer programming trainee classification or that the test was the basis of his being denied the promotion. Woods v. North American Rockwell Corp., 480 F.2d 644 (10th Cir. 1973).
21. Defendant's educational requirements for transfer into the position of computer programmer trainee were not applied in a discriminatory fashion, and were justified by a legitimate business necessity. Goodloe v. Martin Marietta Corp., 7 EPD ¶ 9,167 (D.Colo., January 13, 1972). This case is distinguishable from the many cases which have found unreasonable high school diploma requirements for jobs requiring no formal education, e. g., Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); United States v. Georgia Power Co., 474 F.2d 906 (5th Cir. 1973). Additionally, as in Parham v. Southwestern Bell Telephone Co., 433 F.2d 421 (8th Cir. 1970), plaintiff has suffered no discriminatory effects from the requirement, since he obtained the necessary degree. Also, as in Parham, the record contains insufficient evidence for this Court to conclude that defendant's educational requirement had a discriminatory effect on black applicants for the position of programmer trainee.
22. Plaintiff has failed to establish that he was constructively discharged. The doctrine of constructive discharge has grown out of cases under the National Labor Relations Act, and has been applied to Title VII and § 1981 cases. Montgomery Ward & Co. v. N.L.R.B., 377 F.2d 452 (6th Cir. 1967); Muller v. United States Steel Corp., 509 F.2d 923 (10th Cir.), cert. denied, 423 U.S. 825, 96 S.Ct. 39, 46 L.Ed.2d 41 (1975); Young v. Southwestern Savings and Loan Ass'n, 509 F.2d 140 (5th Cir. 1975). The Court in Young, supra, describes constructive discharge:
"The general rule is that if the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation, then the employer has encompassed a constructive discharge and is as liable for any illegal conduct involved therein as if it had formally discharged the aggrieved employee." 509 F.2d at 144.
23. An assertion of constructive discharge must be supported by proof of specific intent on the part of the employer to induce the employee to quit. N.L.R.B. v. Brennan's, Inc., 366 F.2d 560 (5th Cir. 1966). Plaintiff has failed to adduce any evidence that defendant intended or schemed, by racial discrimination or any other means, to make his working conditions intolerable or that he was being harassed and, thus, forced to quit his job. To the contrary, the record indicates that defendant was solicitous of plaintiff's career development, adjusting plaintiff's working hours to facilitate plaintiff's college work and expending *984 a great deal of time in counseling with him. Moreover, defendant urged plaintiff not to resign, and told him that he would again be considered for promotion in six months if his work performance and job habits improved.