KENTUCKY GENERAL, INC., d/b/a
Norman King Electric, Petition-
er/Cross–Respondent,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent/Cross–
Petitioner.

Nos. 97–6467, 97–6537.

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 11, 1998.

Decided and Filed Feb. 18, 1999. *

sentative Tom Arconti, did make some effort to investigate discrimination claims.

* This decision was originally issued as an "un-published decision" filed on February 18, 1999. On April 20, 1999, the court designated the opinion as one recommended for full-text publication.

**432**

Preston Pugh (argued), Peter Winkler, Aileen A. Armstrong (briefed), NATIONAL LABOR RELATIONS BOARD, APPELLATE COURT BRANCH, Washington, D.C., for Respondent.

James U. Smith, III (argued and briefed), Andrew J. Russell (briefed), SMITH & SMITH, Louisville, Kentucky, for Petitioner.

Before: SUHRHEINRICH and CLAY, Circuit Judges; CARR, District Judge.**

CLAY, Circuit Judge.

Kentucky General, Inc., doing business as Norman King Electric ("Electric"), petitions for review of a National Labor Relations Board ("Board") order finding Electric guilty of unfair labor practices in violation of §§ 8(a)(1) and (3) of the National Labor Relations Act ("NLRA"), 29 U.S.C. § 158(a)(1), (3) (1994). The Board cross-petitions for enforcement of the same order. On appeal, Electric contests the Board's findings that Electric unlawfully discriminated against two employees and six job applicants because of their union affiliations, and challenges the relief provided to the alleged discriminatees by the Board's order. For the reasons stated herein, we DENY Electric's petition and ENFORCE the Board's order.

**I.**

Following an investigation of unfair labor practice charges filed by union members, the International Brotherhood of Electrical Workers, Local Union 1701, AFL–CIO ("Local 1701") filed a consolidated complaint against Electric on September 26, 1995. The complaint alleged, among other things, that Electric violated §§ 8(a)(1) and (3) of the NLRA by interrogating employees and job applicants about their union activities; prohibiting employees from talking with other individuals who were members of Local 1701; advising employees that other employees had been laid off because they filed charges under the Act against the company; failing to hire or consider to hire six union applicants for employment; and terminating two employees because of their union activities.

** The Honorable James G. Carr, United States District Judge for the Northern District of Ohio, sitting by designation.

The Administrative Law Judge ("ALJ") hearing this dispute issued a decision and order on April 7, 1997, sustaining most of Local 1701's allegations of unfair labor practices against Electric. Significantly, the ALJ determined that Electric unlawfully discriminated against six job applicants because of their union affiliation, and unlawfully discriminated against two employees because of their participation in picketing activity. Electric filed timely objections to the ALJ's decision, but on November 7, 1997, the Board overruled Electric's objections and adopted the ALJ's order with minor modifications. The Board ordered Electric to cease and desist its unfair labor practices, and ordered Electric to offer reinstatement and back pay to the two employees improperly discharged and to the six job applicants wrongly denied consideration for employment. Electric filed this timely appeal.

The essential facts, as found by the ALJ and adopted by the Board, are not in dispute. Electric is a Kentucky corporation that installs electrical service in residential, commercial, and industrial establishments. Electric secured an electrical maintenance contract with its client, Vandenburg Foods (also known as "Ragu Foods") in June 1994, to perform electrical installation work at its Ragu plant (the "Ragu project"). Electric then had a workforce of only nine journeymen electricians and three helpers. Electric needed an additional twenty workers, consisting of both electricians and helpers, to staff the Ragu project.

In response to the need for additional employees, Norman King ("King"), the president and owner of Electric, visited the home of Robert McBride, an electrician with thirty years experience, in early June 1994. McBride was employed with Electric from 1989 to 1993, and participated in an unsuccessful union effort to organize Electric's workforce in 1993.[1] Pre-

sumably because McBride had previously demonstrated pro-union sentiments, King asked McBride what he would do if the union again tried to organize the company, to which McBride responded that he would not "drag [Electric] into it." King replied that "that was not the answer he was looking for," but nonetheless offered McBride a job on the Ragu project, beginning June 22, 1994.

King employed Thaddeus McCormic for the Ragu project at the end of July and asked that he report to work on August 8, 1994. McCormic was not a member of Local 1701 and had never been a member of a labor organization. King asked McCormic if he knew of electricians seeking employment. McCormic responded that he knew only electricians that held union memberships. Thereafter, King explained to McCormic that he had been a member of Local 1701, but resigned because the union could not do anything for him. King stated that the union had tried to organize the company but he would avoid signing a contract by attending negotiations four times a year and making impossible demands that the union could not meet. He warned McCormic that union members might approach him because there were union contractors at the Ragu job site. While driving to the Ragu site on August 8, 1994, King told McCormic that he did not care if McCormic became a union member, but cautioned him not to drag Electric into a union campaign.

In an attempt to attract yet more employees, Electric placed an employment advertisement in a local newspaper in early August, 1994, which ran approximately one month. In response to the advertisement, electricians Roger Daniel and Rodney Albin, members of Local 1701, applied for employment at Electric on August 10, 1994. Both men were told by Electric's secretary that the company was still accepting employment applications. Daniel

1. Electric's employees were previously represented by a union, but the employees were not unionized in 1994.

**434**

and Albin completed the application and met with King briefly. It was evident that Albin and Daniel were members of the union since Albin was wearing a t-shirt with the union's logo and Albin's and Daniel's application listed that they were previously employed with companies known to King as union companies. King briefly discussed their employment history and questioned Daniel about his relationship with Harold Baggett, a business agent for Local 1701. King responded that he himself "never could get along with Baggett." King then asked Daniel and Albin several more questions pertaining to the union's organizing efforts with other contractors and specifically asked them whether they were planning to cause any trouble for Electric. Daniel and Albin responded no, and submitted their application to King.

Electricians Timothy Blandford, Jerry Frey, and Alan Rafferty applied for employment at Electric the next day. The secretary informed them that the company was still accepting applications, and King met with these applicants briefly. He asked them where they had been employed, and they responded with the name of contractors that were known by King as union employers.

Jerry Rogers, a union member who is now deceased, applied for an electrician position with Electric on August 15, 1994, and likewise listed recognized union companies as his prior employers. It was apparent from Rogers' application that he had served as a business manager for Local Union 238.

Although Electric received applications from union members Daniel, Albin, Blandford, Frey, Rafferty, and Rogers (the "six applicants"), Electric did not interview or hire any of these men. Instead, Electric hired Tim Cureton on August 16, Gil Therber on August 17, and Jeff McManaway on September 3, 1994.[2] Between August 14 and September 5, 1994, Electric regularly sought electricians from other projects to work overtime on the Ragu project. King

also recruited electricians from the graduating classes at local schools and training institutes. As a result of his search, King recruited Monty Hardman on September 16, 1994. King hired Jeff Jones on October 24, 1994, and Alan Hoffnagle on October 31, 1994. The new hires were not members of Local 1701 or any labor organization.

Despite their statements to King indicating that they would not join a union, McBride and McCormic joined Local 1701 in early August 1994, and engaged in a campaign to organize Electric's workforce. McBride and McCormic participated in a strike and picketing activity against Electric which extended from August 30 to September 6, 1994. Therber joined in the picketing activity. When the strike ended on September 6, 1994, King told them that their positions had been filled, but called them to return to work two days later. King had expressed to McBride his disbelief that McBride was attempting to organize Electric's workforce. Specifically, King stated that he could not believe that "he was doing that to him again."

Supervisor Manuel Bennett informed Electric that he was overstaffed with electricians on September 14, 1994, and requested that King reduce his staff by three electricians by reassigning the workers to different departments. King reviewed the staffing on the Ragu project, and reassigned Michael Cooper, who performed both electrician and service work, to the shop department. However, King laid off McBride and McCormic.

On September 16, 1994, six days after the picketers returned to work, King told McBride that work was "getting slow" and that he had to lay him off. That same day, however, King hired electrician Monty Hardman and informed him that some workers had been causing union problems for the company. King told Hardman that he hoped he was not with them. He stated that Electric would not become a union

**2.** Electric hired McManaway on a part-time basis.

shop. King testified before the ALJ, however, that he decided to lay off McBride, instead of reassigning him to another department, because he performed poorly on the wiring of a control panel, and because Ragu Foods had complained to Electric that it was the poorest wiring job Electric had performed.

King laid off McCormic on September 19, 1994, because of a shortage of work. Before the ALJ, however, King represented that McCormic was also laid off because of his short tenure with the company, which was approximately thirty days, and because McCormic challenged a management decision that King had made. McCormic allegedly commented that he was upset that King had not placed him, instead of another employee, in a temporary supervisory position.

## II.

The Board is vested with the power to prevent unfair labor practices and to remedy violations of the NLRA. This Court has jurisdiction to hear such appeals pursuant to §§ 10(e) and (f) of the NLRA, but the scope of our review of the Board's findings are rather limited. *See* 29 U.S.C. §§ 160(e) and (f) (1994). We review the Board's findings of fact, and its application of the law to the facts, only to determine whether they are supported by substantial evidence. *See id.; Clock Electric, Inc. v. NLRB,* 162 F.3d 907, 911 (6th Cir.1998) (citations omitted). Substantial evidence consists of such relevant evidence that a "reasonable mind might accept as adequate to support a conclusion." *NLRB v. General Sec. Servs. Corp.,* 162 F.3d 437, 441 (6th Cir.1998) (citation omitted). "When there is a conflict in the testimony, 'it is the Board's function to resolve questions of fact and credibility.'" *NLRB v. Aquatech, Inc.,* 926 F.2d 538, 544 (6th Cir. 1991) (citation omitted). Hence, "the Board's reasonable inferences may not be displaced on review even though [we may] justifiably have reached a different conclusion." *Turnbull Cone Baking Co. v.*

*NLRB,* 778 F.2d 292, 295 (6th Cir.1985); *Uforma/Shelby Bus. Forms, Inc. v. NLRB,* 111 F.3d 1284, 1292 (6th Cir.1997).

An employer violates § 8(a)(1) of the NLRA when it "interfere[s] with, restrain[s], or coerce[s] employees in the exercise of" their rights to "form and join unions and to 'engage in other concerted activities for the purpose of ... mutual aid or protection'" *Manimark Corp. v. NLRB,* 7 F.3d 547, 549 (6th Cir.1993). Similarly, an employer violates § 8(a)(3) of the NLRA when it "discriminate[s] against employees in regard to hiring or firing to discourage membership in any labor organization." *NLRB v. Talsol,* 155 F.3d 785, 797 (6th Cir.1998) (citation omitted). Thus, generally when an employer refuses to hire or discharges an individual because of his union affiliation, and has no other basis for its actions, the employer has committed an unfair labor practice. *See id.*

To establish a violation of §§ 8(a)(1) and (3) of the NLRA, the general counsel of the Board must make a prima facie showing that the employee's exercise of protected rights was a "motivating factor" in the employer's decision. *See Grand Rapids Die Casting Corp. v. NLRB,* 831 F.2d 112, 116 (6th Cir.1987). Specifically, the general counsel must establish that (i) an individual was engaged in a protected activity, (ii) the employer was aware of the protected activity, and (iii) that the employee's protected activity motivated the adverse treatment. *See Birch Run Welding & Fabricating, Inc. v. NLRB,* 761 F.2d 1175, 1179 (6th Cir.1985). "Anti-union motivation may be reasonably inferred from a variety of factors, such as a company's expressed hostility towards unionization together with knowledge of the employees' union activities, proximity in time between the employees' union activities and their discharges, the inconsistencies between the proffered reason and other actions of the employer, and disparate treatment of certain employees compared to other employees with similar

work records or offenses." *Hyatt Corp. v. NLRB*, 939 F.2d 361, 375 n. 7 (6th Cir. 1991). Circumstantial evidence alone is sufficient to create an inference of anti-union animus on the part of an employer. *See Turnbull Cone Baking*, 778 F.2d at 297. If the general counsel establishes that an employer's anti-union animus is a motivating factor in its decision, the employer can rebut the inference only by demonstrating that it would have taken the adverse action notwithstanding the employee's protected activity. *See NLRB v. Transp. Management Corp.*, 462 U.S. 393, 400–03, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983) (citations omitted).

## III.

On appeal, Electric argues that the Board erred in its conclusion that Electric violated § 8(a)(3) of the NLRA when it did not hire six applicants, and when it fired two employees, because of the company's anti-union animus. First, Electric alleges that the Board failed to establish a prima facie case that Electric unlawfully discriminated against individuals because of their union membership. Second, Electric asserts that there is not substantial proof in the record to establish that Electric's asserted business justifications were pretextual. We conclude, however, that substantial evidence supports the Board's findings.[3]

## A.

Electric does not dispute that it has expressed anti-union sentiments, but contests the Board's conclusion that its anti-union animus motivated its decision to terminate McBride and McCormic. Indeed,

Electric admits that it does not desire to have another union organizing campaign undertaken, and that King's questioning of McBride and McCormick about their organizing efforts demonstrate anti-union animus. Electric contends, however, that the desire of a nonunion subcontractor to remain non-unionized is based on legitimate business reasons, and consequently cannot be used as conclusive proof that he unlawfully discriminated by terminating two union members. Electric alleges that the Board erroneously concluded that McBride and McCormick were laid off because of their picketing activity, when the record shows that they were laid off because the Ragu project was phased out.

■ Contrary to Electric's contentions, we find that substantial evidence supports the Board's conclusion that Electric's anti-union animus motivated its decision to terminate McBride and McCormic. Electric does not contest the Board's finding that King subjected both McBride and McCormic to coercive remarks designed to curb pro-union sentiments at the time of their hiring. Moreover, he was aware of McBride and McCormic's union membership since they publicly supported the union's efforts to organize Electric's workforce. Indeed, the record reveals that McBride solicited union authorization cards from other employees, and that McCormick signed the membership card in front of a company supervisor and other employees. Moreover, Electric's decision to lay off both men only a few days after they engaged in picketing bolsters the inference that Electric terminated them because of their union activities. Hence, Electric's expressed hostility towards unionization, awareness of McBride's and

---

3. As a preliminary matter, the Board claims that it is entitled to summary affirmance of its uncontested findings, namely that Electric violated § 8(a)(1) of the NLRA by coercively interrogating one employee and warning others not to engage in union activity at the company. Indeed, Electric has failed to contest these findings of violations on appeal, and has explicitly conceded some of these findings in its brief. Therefore, the Board is entitled

to summary enforcement with respect to these § 8(a)(1) violations. *See Talsol Corp.*, 155 F.3d at 793 (recognizing that an employer's "failure to address or take issue with the Board's findings and conclusions ... effectively results in abandonment of the right to object to those determinations"). Thus, by not presenting arguments contradictory to the Board's findings, Electric has "effectively admitted the truth of those findings." *Id.*

McCormic's union activities, and the short time lapse between McBride and McCormic's participation as picketers and their lay offs, support the Board's finding that the general counsel presented prima facie proof that Electric laid off McBride and McCormic because of their union activity.

 We similarly reject as pretextual Electric's proffered nondiscriminatory justification for the adverse employment action taken against McBride and McCormic. We find unpersuasive Electric's argument that it laid off McBride and McCormick because the company was experiencing an economic downturn. The record reflects that Electric hired another electrician the same day Electric laid off McBride, and hired two additional electricians the following month. *See Dayton Typographic Serv., Inc. v. NLRB*, 778 F.2d 1188, 1193 (6th Cir.1985) (finding the employer's "lack of work" defense unconvincing where the employer hired two new employees to do part-time work in the same department as the discharged employee). Significantly, Electric did not contest the Board's finding that Electric received notification of Ragu Foods' desire to curtail the Ragu project only after it laid off McBride and McCormic.

Additionally, we find unpersuasive Electric's argument that it selected McBride for lay off because of his poor work performance since Electric did not terminate McBride immediately after he performed poorly on the control panel, but entrusted McBride with another assignment requiring experience and advanced technical skills. *See Aquatech*, 926 F.2d at 546–47 (finding that employer had discriminatory motive in discharging the employee when there was a hiatus between asserted employee problem and discipline). Significantly, McBride completed that project successfully and testimony from one of Electric's employees indicated that McBride was not at fault for the control panel since there were several problems with the panel before he was assigned to the task. In sum, we believe that these findings support the Board's determination that Electric's proffered reasons for laying off McBride and McCormic were pretextual, and thereby designed to mask its discriminatory actions. The cumulative effect of the evidence does not suggest that Electric would have terminated McBride and McCormic notwithstanding their protected activities.

**B.**

Electric next contends that the record does not support the Board's finding that it failed to consider six job applicants due to anti-union animus. The record shows that Electric placed an advertisement for electricians and helpers, which ran during August 1994. In response to the advertisement, six electricians with union affiliations applied for employment with Electric. The applicants' union affiliations were apparent from their applications and discussions with King. None of the applicants received offers of employment from King after submitting their applications, but Electric nevertheless hired six other electricians who did not have union affiliations.

Electric asserts that it is unreasonable to infer from these facts that its negative attitude towards the union influenced its decision not to hire the six applicants. Electric alleges that it simply "did not have occasion to look to the applicant pool created by these applicants as a source for new hires." Instead, Electric asserts that it hired Cureton, McManaway, Hoffnagle, and Therber to staff the Ragu project because the company was familiar with their work, and states that Cureton, Hoffnagle, and Therber were extended employment before receipt of the applications from the union electricians. Electric claims Jones was hired as a result of a recommendation from an employee. Thus, Electric contends that it is not "illegitimate or discriminatory to hire individuals whose skills are known, no matter what the source of that knowledge."

We agree with Electric's contention that an employer does not engage in unlawful discrimination merely by hiring applicants based on referrals or personal knowledge of the applicant's abilities, even if the result is that similarly qualified applicants are not hired. However, we find that Electric's assertions in this case are pretextual. First, the record reflects that Electric did not have actual knowledge of Cureton and McNanaway's skills. Indeed, Cureton and McNanaway were not previous employees of Electric, and King "testified only in generalities concerning his asserted knowledge of their skills." [4] *See Aquatech*, 926 F.2d at 544 (stating that this Court will ordinarily not disturb credibility determinations of the Board). Second, Electric's actions are inconsistent. Electric hired Jones on the basis of another employee's recommendation, but refused to pursue the situation further when McCormic told King that he was aware of union electricians that were seeking employment. Third, King's brief discussion with each job applicant appears to have been designed to discern the applicant's union sympathies. Indeed, King specifically asked Daniel and Albin whether they were planning to cause trouble for Electric. Finally, even after receipt of the applications by the union electricians, Electric still sought electricians for the Ragu project. Electric sought word-of-mouth recommendations from current employees, and looked for prospects from several schools and training institutes.

These facts, when combined with the facts that Electric's secretary told the applicants that the company was hiring; the advertisement ran approximately three weeks after the applicants sought employment; and, that Electric's new hires were all unaffiliated with the union, suggest that Electric did not consider the six job applicants because of their status as union members. *See Phelps Dodge Corp. v.*

*NLRB*, 313 U.S. 177, 187–88, 61 S.Ct. 845, 85 L.Ed. 1271 (1941) (recognizing that an employer unlawfully discriminates when it refuses to hire job applicants because of their union membership). Electric's proffered nondiscriminatory justifications for its actions do not pass muster. We therefore conclude upon review of the whole record, substantial evidence supports the Board's finding that Electric chose not to hire the six applicants on account of their union affiliations.

## IV.

The Board directed Electric to offer McBride and McCormic reinstatement to their former jobs, and offer the six union-affiliated applicants employment in the positions for which they applied, or alternatively, employment in substantially equivalent positions. Electric contends that the Board abused its discretion when it ordered these remedies to the discriminatees because the general counsel did not prove that Electric would have employed any of these individuals beyond the duration of the Ragu project, notwithstanding Electric's unlawful conduct.

Section 10(c) of the NLRA authorizes the Board, upon finding a violation of the Act, to order the violator "to take such affirmative action including reinstatement of employees with or without back-pay, as will effectuate the policies of the Act." 29 U.S.C. § 160(c) (1994). Hence, the Board's "remedial authority is 'a broad discretionary one, subject to limited judicial review.'" *Colfor Inc. v. NLRB*, 838 F.2d 164, 167 (6th Cir.1988) (citation omitted). We therefore may not disturb a Board's order unless it constitutes an abuse of discretion. *See id.* at 168; *see also Adair Standish Corp. v. NLRB*, 912 F.2d 854, 864 (6th Cir.1990) (stating that "[a] remedial order of the Board will not be disturbed 'unless ... the order is a patent attempt to achieve ends other than

---

4. The record indicates that Therber previously worked for Electric, but he was employed

with the company for less than five days.

those which can fairly be said to effectuate the policies of the [NLRA]' ").

■ We conclude that the Board did not abuse its discretion in ordering the traditional remedy of reinstatement, employment, and backpay for the discriminatees. *See Compuware Corp. v. NLRB*, 134 F.3d 1285, 1291 (6th Cir.1998) (citation omitted) (finding that reinstatement with backpay is the "normal" method of remedying an employer's unlawful refusal to hire and/or unlawful discharge of an employee); *see also Phelps Dodge*, 313 U.S. at 187–89, 61 S.Ct. 845. We decline review, however, of Electric's arguments regarding whether the ordered remedy should be tailored because the discriminatees would have been terminated at the end of the Ragu project. This Court has recognized that this issue is best addressed at the compliance stage of the order, where a backpay and reinstatement order is specifically tailored to the unfair labor practices of an employer. *See Compuware*, 134 F.3d at 1291–92; *Dean General Contractors*, 285 NLRB 573, 1987 WL 89852, at *1–3 (1987) (recognizing that the determination of whether an employee's tenure with an offending employer would have continued past the project's end is a factual question best left for resolution at the compliance phase); *Sure–Tan, Inc. v. NLRB*, 467 U.S. 883, 900–01, 104 S.Ct. 2803, 81 L.Ed.2d 732 (1984) (recognizing that a bifurcated procedure is an appropriate way to customize a remedy that will cure unfair labor practices). This case has not proceeded to the compliance phase, and Electric's claim is therefore not yet ripe for review.

## V.

For the aforementioned reasons, we DENY Electric's petition and ENFORCE the Board's order.