*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2002 FED App. 0249P (6th Cir.)
File Name: 02a0249p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

BEVERLY HEALTH AND
REHABILITATION SERVICES,
INC., et al.,
*Petitioners/*
*Cross-Respondents,*

*v.*

NATIONAL LABOR RELATIONS
BOARD,
*Respondent/*
*Cross-Petitioner.*

Nos. 00-2397/2507

On Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board.
Nos. 6-CA-27342; -27453; -27581; -27731; -28151;
-28394; -28623; -28624; -28760.

Argued: June 21, 2002

Decided and Filed: July 25, 2002

Before: CLAY and GILMAN, Circuit Judges; HAYNES,
District Judge.*

———————————

*The Honorable William J. Haynes, Jr., United States District Judge
for the Middle District of Tennessee, sitting by designation.

1

———————————

**COUNSEL**

———————————

**ARGUED:** Thomas P. Dowd, LITTLER MENDELSON, Baltimore, Maryland, for Petitioners. Usha Dheenan, NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent. Craig Becker, Chicago, Illinois, for Intervenor. **ON BRIEF:** Thomas P. Dowd, LITTLER MENDELSON, Baltimore, Maryland, for Petitioners. Usha Dheenan, Aileen A. Armstrong, Charles P. Donnelly, Jr., NATIONAL LABOR RELATIONS BOARD, Washington, D.C., for Respondent. Craig Becker, Chicago, Illinois, for Intervenor.

———————————

**OPINION**

———————————

HAYNES, District Judge.    Beverly Health and Rehabilitation Services, and its wholly owned subsidiary Beverly Enterprises--Pennsylvania Inc., (collectively "Beverly Health") appeal the National Labor Relations Board's order finding that Beverly Health violated Sections 8(a)(1) and (5) of the National Labor Relations Act ("the Act") by unilaterally implementing disciplinary work rules, modifying work schedules, and altering the job duties of certain employees after the expiration of its collective bargaining agreement with the Union.

Acting on unfair labor practice charges filed by the Union, the National Labor Relations Board ("the Board") issued a complaint, alleging, in pertinent part, that Beverly Health violated Sections 8(a)(1) and (5) of the Act by maintaining disciplinary rules that were overly broad and tended to restrain, interfere with, and coerce employees in the exercise of their rights under Section 7 of the Act; suspending employee Oneita Say because she engaged in protected union activities; and refusing to bargain in good faith with the

Union by unilaterally implementing revised disciplinary rules, work schedules, job descriptions, and duties.

After a hearing, an Administrative Law Judge ("ALJ") issued a decision finding merit in most of the Union's allegations. The Board affirmed the ALJ's findings and conclusions with minor modifications. Beverly Health filed a petition seeking review of only two aspects of the Board's order: (1) the finding that Beverly Health violated the Act by unilaterally changing the work schedules of certain employees and by unilaterally implementing new disciplinary rules; and (2) the finding that disciplinary rule 1.4 was unlawful. The Board filed a cross application for enforcement of the order. For the reasons set forth below, we **DENY** Beverly Health's petition for review and **GRANT** the Board's application for enforcement.

## I. BACKGROUND

Beverly Health operates a number of nursing homes throughout Pennsylvania, including Caledonia Manor, Grandview Healthcare Center, and Beverly Manor of Lancaster ("Duke") facilities. Service Employees International Union, AFL-CIO, CLC and its Locals 585 and 668 (collectively the "Union") represent separate bargaining units of service and maintenance employees units at Beverly Health's Pennsylvania facilities. At the Duke facility, the most recent collective-bargaining agreement ("CBA") covering those employees extended from December 20, 1991 to December 31, 1994. At the Grandview facility, the most recent contract ran from March 30, 1992, to December 31, 1994.

The management-rights clause of the parties' CBAs provided:

The Employer retains the exclusive right to manage the facility; to direct, control, and schedule its operations and the workforce and to make any and all decisions affecting the business, whether or not specifically mentioned

herein. Such prerogatives, authority, and functions shall include but are not limited to the sole and exclusive right to:

a. Hire, promote, demote, layoff, assign, transfer, suspend, discharge or discipline associates for just cause;

b. Select and determine the number of its associates including the number assigned to any particular work;

c. To increase or decrease that number;

d. Direct and schedule the work force;

e. Determine the location and type of operation;

f. Determine and schedule when overtime shall be worked;

g. Install or remove equipment;

h. Determine the methods, procedures, materials, and operations to be utilized or to discontinue their performance by associates of the Employer and/or to contract the same;

i. Establish, increase or decrease the number of work shifts and their starting and/or ending times;

j. Transfer or relocate any or all of the operations of the business to any location or to discontinue such operations;

k. Determine the work classifications of associates and job description content.

l. Promulgate, post, and enforce reasonable rules and regulations, policies and procedures, governing the conduct and action of associates during the work hours;

disciplinary rules, revising and reducing certain employees' work schedules, and revising LPNs job descriptions and duties.

### C. Is the Board is entitled to summary affirmance of its uncontested findings?

Beverly Health does not contest the Board's finding that it violated Section 8(a)(1) of the Act by promulgating and maintaining disciplinary rule 1.6 and by suspending employee Oneita Say because she engaged in protected union activities. Consequently, the Board contends that the Beverly Health has waived its right to contest these findings, and that it is entitled to summary affirmance of its findings on these matters.

The Act provides, in pertinent part, that:

No objection that has not been urged before the Board, its member, agent, or agency, shall be considered by the court, unless the failure or neglect to urge such objection shall be excused because of extraordinary circumstances.

29 U.S.C. § 160(e).

Further, this Court has repeatedly granted summary enforcement of a Board's order in situations, such as this, where a respondent does not challenge the Board's findings. *See, e.g.*, *NLRB v. Tri-State Warehouse & Distributing, Inc.*, 677 F.2d 31, 32 (6th Cir. 1982) ("Since the respondents did not make a timely challenge to the Board's findings, those findings are entitled to summary enforcement."). In addition, there is substantial evidence in the record to support the Board's finding that Beverly Health violated Section 8(a)(1) by promulgating and maintaining disciplinary rule 1.6 and by suspending employee Oneita Say.

### III. CONCLUSION

For the reasons set forth above, we **DENY** Beverly Health's petition for review and **ENFORCE** the Board's Order.

post-expiration context to make changes in the same fashion that it did during the life of the contract.

Yet, Beverly Health, citing *Control Services Inc.*, 303 NLRB 481 (1991) and *Ryder/Ate, Inc.*, 331 NLRB No. 110 (2000), acknowledges that the Board has held in several recent cases that a Management Rights clause is a waiver of a union's right to bargain and, as such, cannot continue automatically with the other terms and conditions of employment when a contract expires.

We conclude that the Board's reliance on *Buck Creek Coal*, 310 NLRB 1240 (1993), and *Holiday Inn of Victorville*, 284 NLRB 916 (1987), was justified, and that the Board's interpretation of the Act was permissible and reasonably defensible.

**(3)   Purposes of the NLRA**

Finally, Beverly Health contends that the Board's interpretation of the Act is unreasonable because it is incompatible with the NLRA's goal of maintaining stable bargaining relationships. First, Beverly Health asserts that the Board's refusal to extend the management-rights clause exacerbates the difficulties associated with negotiating a replacement contract. Second, Beverly Health contends the Board's decision acts to change the balance negotiated by the parties.

We disagree, and find that the Board's interpretation of the Act is consistent with the purposes of Section 8(a)(5) of the Act, a statute which is intended to protect employee's rights to bargain through their representatives.

For these reasons, the Board's interpretation of the NLRA is permissible and reasonably defensible. We affirm the Board's conclusion that the management-rights clause here did not continue after the termination of the contract, and, consequently, that Beverly Health violated Sections 8(a)(1) and (5) of the Act by unilaterally implementing revised

m.   Select supervisory associates; establish, determine content of, and implement such training programs;

n.   Train associates, establish, determine content of, and implement such training programs.

o.   Discontinue any department or branch;

p.   Introduce new and improved methods of operations;

q.   Establish, change, combine, or abolish job classifications, and determine job content and qualifications; and

r.   Set standards of performance of the associates.

And in all respects carry out in addition, the ordinary and customary functions of management, except as specifically altered or modified by the terms of this Agreement.

The Union also represents a unit of licensed practical nurses ("LPNs") at Grandview. Although the Board certified the Union as the collective-bargaining representative of the LPNs unit for Board Case No. 6-RC-10978, Beverly Health has refused to bargain, contending that LPNs were supervisors as defined by Section 2(11) of the Act, and therefore, were not entitled to representation. After the close of the hearing in this case, but before the ALJ issued its opinion, the Court of Appeals for the District of Columbia Circuit enforced the Board's order requiring Beverly Health to bargain with the Union on behalf of the LPNs. At the time of the unfair labor practices at issue, the LPNs did not have a CBA.

In October of 1994, the parties commenced negotiations for successor service and maintenance agreements for the Duke and Grandview CBAs that were scheduled to expire on December 31, 1994. No agreement was reached by the parties by December 31, 1994. The parties extended all

aspects of the contract until January 23, 1995, at which point the contracts terminated pursuant to a letter from Beverly Health stating that it would not extend the agreements. Beverly Health and the Union agreed to maintain the status quo during the post-January 23 bargaining time frame, as required by law. At the time of the CBA termination, the parties had not reached an impasse in negotiations.

## A. Implementation of New Disciplinary Policies

While negotiations continued between the parties, Beverly's Labor Relations Manager, Ronald St. Cyr, sent a letter dated April 21, 1995 to the Union's chief negotiator, John Haer, to inform him that Beverly Health would modify and standardize its disciplinary policy at the union-represented facilities effective June 1, 1995. This letter also reflected that the changes would "remain in effect until such time as management determines that further changes are necessary." The new policy stated that failure to follow the new rules would result in discipline, up to and including discharge.

The newly instituted rule 1.4 provided that "refusing to cooperate in the investigation of any allegation of patient (resident) neglect or abuse or any other alleged violation of company rules, laws, or government regulations" would result in a suspension pending an investigation for discharge. Further, rule 1.6 imposed the same penalty for "making false or misleading work-related statements concerning the company, the facility, or fellow associates."

On April 27, 1995, at a negotiating session, Haer demanded that Beverly Health bargain over the new disciplinary rules and requested information regarding the existing policies. Beverly Health provided Haer with a copy of the existing policies, and informed him that the new policy was being implemented in all the nursing homes in the region. On May 18, 1995, Haer sent a letter to St. Cyr stating that the Union's position was that Beverly Health could not

having chosen not to adopt the contract, cannot as a general proposition rely on the management-rights clause to promulgate new rules unilaterally without affording the union an opportunity to bargain. Further, there is no indication in the management-rights clause at issue here that it was intended to outlive the contract.

*Id.* at 916.[2] *See also Buck Creek Coal*, 310 NLRB 1240 (1993) (following *Holiday Inn*) ("Moreover, we note that a waiver of bargaining rights contained in a contractual management-rights provision normally is limited to the time during which the contract that contains it is in effect."); *Furniture Rentors of America v. NLRB*, 36 F.3d 1240, 1245 (3d Cir.1994) (holding that the management-rights clause did not survive the expiration of a contract because there was no clear waiver of the right to negotiate when the contract specified that it would end as of a specific date, but would reopen to discuss "only wages").

Beverly Health contends that the two cases relied upon by the Board have limited application and do not apply to the case at hand:

*Holiday Inn* only stood for that proposition in the successorship context, and the Board's citation of the same principle in *Buck Creek* was limited to the context of a subsequently negotiated tentative agreement that was rejected by the employees. The statement should not be read as a principle applicable to ordinary contract expiration situations, and certainly should not be read as being contrary to the idea that past practice established by Management Rights clauses permit employers in a

---

[2]The Board in *Holiday Inn* also stated that "work rules and practice promulgated by virtue of the management-rights clause *during the term of the contract*" do not expire with the contract termination, but are instead "kept in place by virtue of Section 8(a)(5)." *Id.* at 916. (emphasis added). We find that this language is consistent with *Shell Oil*.

the management-rights clause of the CBA, and not the existence of the management-rights clause itself, that allows the employer's past practice of unilateral change to survive the termination of the contract.

Here, Beverly Health has not introduced evidence of its prior exercise of the management-rights clause, i.e., has not introduced evidence of a pattern of unilateral change to work schedules and disciplinary rules during the term of the parties' CBA. Rather, Beverly Health attempts to justify its post-termination changes based on the mere existence of the management-rights clause in the expired contract. Consequently, Beverly Health's post-expiration unilateral changes to work schedules and disciplinary rules are inconsistent with established case precedent.

**(2)   *Holiday Inn of Victorville* Case Precedent**

Here, the ALJ concluded, and the Board agreed, that "the management-rights provision language amounted to a waiver by the Unions of their right to bargain on this subject during the term of the contract. When the contract expired, so did the Unions' waiver." In concluding that the management-rights clause did not survive the termination of the underlying contract, the Board cited *Buck Creek Coal*, 310 NLRB 1240 (1993), and *Holiday Inn of Victorville*, 284 NLRB 916 (1987).

In *Holiday Inn of Victorville*, the Board addressed the issue of whether a management-rights clause outlives the term of a contract to apply to a successor employer who does not adopt the contract. The Board stated:

> A management-rights clause is not a term and condition of employment in the same sense . . . Given the established rule that such waivers must be clear and unmistakable, *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 702 (1983), . . . the waiver normally would be limited to the time during which the contract that contains it is in effect. Thus, . . . a successor employer,

unilaterally modify work rules at union-represented facilities. St. Cyr responded that the modification of the disciplinary policies was permitted by the management-rights clause of the expired CBA, and, therefore, that Beverly Health was not required to bargain over the matter, stating:

> Under our agreements, the substance of the disciplinary rules codes or conduct are at the discretion of management. Only disciplinary procedures (grievance-arbitration) have been the subject of negotiation and contract. This is affirmed by the management's right clause, the zipper clause, past practice, and usual practices of collective bargaining.

In a letter dated June 8, 1995, Haer repeated the Union's request to bargain over the new rules. In a letter dated June 23, 1995, St. Cyr responded that Beverly Health's position regarding the disciplinary rules remained unchanged. At the next bargaining session on July 24, 1995, St. Cyr advised the Union that the new disciplinary policy, including rules 1.4 and 1.6, had been implemented in all of Beverly Health's Pennsylvania facilities. Haer reiterated the Union's request to bargain over the new policy. Beverly Health again responded that they were not required to bargain over the matter.

The NLRB's General Counsel filed a complaint, contending that the implementation of the disciplinary policy violated Section 8(a)(5) of the Act at the Grandview and Duke facilities, where the CBAs had expired.

**B.  Suspension of Oneita Jane Say**

On August 2, 1995, Union Steward Oneita Say and Gloria Culp, then President of Local 585, visited Tamara Montell, the Grandview administrator, to discuss problems that employees had raised with Say concerning supervisor Donna Puleo's conduct. Montell told Say and Culp that she found the allegations hard to believe, but that she would investigate the matters and get back to them. The next day, when Say

began her shift, Puleo approached Say, began hounding her about her conversation with Montell, and accused her of lying. Say responded that as a union steward, her job required her to present complaints and problems of her coworkers on the eleven to seven shift, which she was doing by speaking with Montell.

On August 4, 1995, Puleo provided Montell a written account accusing Say of making false or misleading statements, resident neglect, and of insubordination. Say was also given an associate memorandum suspending her pending further investigation for allegedly violating rule 1.6 by making false or misleading work-related statements concerning co-workers and for subordination. Culp, who was present when Say was given the memorandum, responded that the Union did not agree with the suspension because the new disciplinary policies that had been put into effect had not been first negotiated by the Union. Angela Huffman, director of nursing at Grandview, later investigated the complaint and concluded that Say would be given the opportunity to return to work after a two-week suspension.

At a bargaining session on August 7, 1995, Haer raised the issue of the suspension as an example of what the Union objected to under rule 1.6 and as one of the reasons that the Union wanted to bargain over the new disciplinary policies. Beverly Health's representative again reiterated that Beverly Health would not bargain about its disciplinary policy. Haer then questioned how Beverly Health could distinguish between a false statement and a genuine misunderstanding. Beverly Health responded that such issues were resolved in the grievance procedures.

**C. Revision of Work Schedules and Change in LPN Job Description**

On May 5, 1995, Montell summoned Culp and Union Steward Larry Winger to a meeting at the facility. Montell advised them that due to a decline in the number of residents,

therein violate the statutory duty to bargain in good faith. We are persuaded and find that Respondent's frequently invoked practice of contracting out occasional maintenance work on a unilateral basis . . . had also become an established employment practice and, as such, a term and condition of employment.

*Id.* at 287.

Beverly Health also cites several other cases that followed the *Shell Oil* decision, characterizing those cases as follows:

There is a common thread running through each of the cases discussed above. A Management Rights Clause establishes a practice as to what an employer can do regarding certain terms and conditions of employment. Since the terms . . . must be maintained as part of the status quo following expiration of the contract, the parties' past practice regarding decisions involving those same terms and conditions of employment also must continue after contract expiration. The past practice is controlled by the Management Rights clause. So long as an employer continues to make decisions in accordance with the Management Rights clause, **there has been no change in the status quo and no unlawful unilateral change under Section 8(a)(5) of the Act**.

(Emphasis in original.) Beverly Health further contends that "[i]n view of the Board's unexplained departure from the well reasoned *Shell Oil* line of cases, no deference is due to the Board's conclusion of law in this particular case."

We interpret *Shell Oil* and its progeny as standing for the proposition that if an employer has frequently engaged in a pattern of unilateral change under the management-rights clause during the term of the CBA, then such a pattern of unilateral change becomes a "term and condition of employment," and that a similar unilateral change after the termination of CBA is permissible to maintain the status quo. Thus, it is the actual past practice of unilateral activity under

Thus, the issue before us is whether the Board's interpretation of the NLRA – that the management-rights clause does not survive the termination of the contract – is based on a "permissible interpretation" of the statute. Beverly Health contends that the Board's interpretation of the Act was not reasonable because it is inconsistent with case precedent and the purposes of the NLRA.

Under the NLRA, a union has a statutory right to bargain over the mandatory bargaining subjects of wages, hours, and terms and conditions of employment. *See* 29 U.S.C. §§ 158 (a)(1); 158 (a)(5); 158(d). A union can waive its statutory right to bargain, but such a waiver must be "clear and unmistakable." *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 708 (1983). A management-rights clause is a waiver of the union's right to bargain over these matters.

First, Beverly Health contends that the management-rights clause is a term and condition of employment, which survives the expiration of the contract because it relates to the employer-employee relationship, rather than the employer-union relationship. Second, Beverly Health contends that the management-rights clause is a past practice under which the company is permitted to make unilateral changes post-termination to maintain the status quo, citing *Shell Oil*, 149 NLRB 283 (1964), and its line of cases.

**(1)  *Shell Oil* Case Precedent**

In *Shell Oil*, the employer had the right to subcontract work out unilaterally under the expired contract and had routinely exercised that right during the term of the contract. The Board found that the employer's practice of continuing to subcontract work unilaterally did not violate Section 8(a)(5) of the Act, stating:

[I]t is well settled that notwithstanding the termination of a labor contract, the parties, pending its renewal or renegotiation, have the right and obligation to maintain existing conditions of employment. Unilateral changes

the work schedules of nurses' aides and employees in the dietary, housekeeping, and laundry departments would be reduced.

Culp replied that because Beverly Health had not negotiated with the Union over the changes to the work schedules, the Union did not agree with the changes. On May 10, 1995, the Union received copies of memoranda to employees notifying them of the reduction in hours, and stating that if the employees were unable to work reduced schedules, then they would be laid off.

On May 12, 1995, Haer sent a letter to Montell on behalf of the Union, demanding bargaining over the reduction in work hours. The letter concluded by requesting that Montell contact the Union immediately to schedule a bargaining meeting, but she did not answer the letter. Haer subsequently called Montell about the work reduction issue, but she did not get back to him.

On June 8, 1995, Haer sent St. Cyr a letter which, in part, concerned the disciplinary policy, and mentioned that he had not received a response to his May 12, 1995 letter. St. Cyr responded in a letter dated June 23, 1995 that the reduction in work hours was "necessitated by falling census and a need to operate within good business practices as provided for under the Management Rights of the CBA, a clause which remains effective during period when no contract extension exist."

Also in June of 1995, Grandview issued new job descriptions to the LPNs, reclassifying them as "supervisors." Although the new job descriptions involved new responsibilities for the LPNs, the actual duties as performed by the LPNs remained the same as before, with the exception of the fact that the LPNs began completing evaluations of the nursing assistants. The Union did not request bargaining over this matter because Beverly Health refused to bargain with the Union in order to test the Board's certification in the underlying certification case.

On July 10, 1995, Haer again repeated the Union's request for bargaining on the issue of change and reduction in work schedules. Haer advised Beverly Health that the Union had filed an unfair labor practice charge with the Board. St. Cyr responded that Beverly Health was not required to bargain over the reduced hours and schedules because it was a management prerogative covered by the management-rights clause of the expired contract.

### *Procedural Background*

Based on the Union's charges and amended charges filed in 1995 and 1996, the Board issued a series complaints, subsequently consolidated into an amended complaint, that the Board issued on May 23, 1997.

The latter complaint alleged that Beverly Health violated the Act by: (1) maintaining disciplinary rules that violated Section 8(a)(1) because they were overbroad and tended to restrain, interfere with, and coerce employees in the exercise of their rights under Section 7 of the Act; (2) providing information to employees on how to obtain objector status under *Communications Workers of America v. Beck*, 487 U.S. 735 (1988), in violation of Section 8(a)(1); (3) suspending employees Oneita Jane Say and Robert Reid, as well as suspending and terminating employee Denise Foltz, in violation of Section 8(a)(3); and (4) unilaterally implementing new disciplinary policies and work rules without bargaining with the Union and unilaterally modifying work hours and schedules in violation of Section 8(a)(5) and (1).

After a hearing, the ALJ issued a decision finding that Beverly Health had acted lawfully with respect to the following claims: (1) advising employees of their rights under *Beck*; (2) the suspension of employee Robert Reid; and (3) the suspension and termination of Denise Foltz.

The ALJ found that Beverly Health violated Section 8(a)(1) and (5) of the Act by unilaterally implementing revised disciplinary rules, hours of work, job descriptions and duties.

revising and reducing certain employees' work schedules.[1] Beverly Health contends that its unilateral changes to the disciplinary rules and work schedules were authorized by the management-rights clause of the parties' expired CBA, which it contends survived the expiration of the contract. The ALJ concluded, and the Board agreed, that the management-rights clause amounted to a waiver by the Union, and that such waiver terminated with the expiration of the contract. Resolution of this issue turns on whether the management-rights clause of the parties' expired CBA remained in effect after the termination of the contract so as to constitute a waiver of the Union's right to bargain over these changes.

As noted above, the Act provides that it is an unfair labor practice for an employer to refuse to bargain collectively with the representatives of his employees, 29 U.S.C. § 158(a)(1), over such issues as "wages, hours, terms, and conditions of employment." 29 U.S.C. § 158(d). The Act, however, is silent on the question of an employer's obligation to maintain existing wages, hours, and other working conditions after the expiration of a collective bargaining agreement. Because the resolution of this issue involves the Board's interpretation of the National Labor Relations Act, the question is whether the Board's "answer is based on a permissible construction of the statute." *Chevron U.S.A., Inc. v. Natural Resources Defense Counsel, Inc.*, 467 U.S. 837, 843 (1984). *See also NLRB v. Main Street Terrace Care Ctr.*, 218 F.3d 531, 537 (6th Cir. 2000) (citations omitted) ("[T]he Board's interpretation of the NLRA must be upheld if reasonably defensible."). *Accord NLRB v. Foundry Div. of Alcon Industries, Inc.*, 260 F.3d 631, 635 (6th Cir. 2001).

---

[1] Beverly Health originally contended that its unilateral modification of LPN job duties and descriptions was permissible under the management-rights clause of the parties' expired CBA. Subsequently, Beverly Health withdrew "the LPN element from its management rights arguments."

**B. Did the Board err in finding that Beverly Health violated Section 8(a)(1) and (5) of the Act by unilaterally implementing revised disciplinary rules, revising and reducing certain employees' work schedules, and revising LPNs job descriptions and duties?**

An employer violates Section 8(a)(1) of the Act by "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise of the rights guaranteed in section 157 [Section 7] of this title." 29 U.S.C. § 158(a)(1). Further, an employer violates Section 8(a)(5) of the Act by "refus[ing] to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title." 29 U.S.C. § 158(a)(1). Section 8(d) of the Act defines the parties' obligation to bargain collectively as "the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, terms, and conditions of employment . . . ." 29 U.S.C. § 158(d).

An employer violates Section 8(a)(5) of the Act if, "without bargaining to impasse, it effects a unilateral change of an existing term or condition of employment." *Litton Financial Printing Div. v. NLRB*, 501 U.S. 190, 198 (1991) (citing *NLRB v. Katz*, 369 U.S. 736 (1962)). An employer's "unilateral change in conditions of employment under negotiation is similarly a violation of § 8(a)(5), for it is a circumvention of the duty to negotiate which frustrates the objectives of § 8(a)(5) much as does a flat refusal." *Katz*, 369 U.S. at 743. This Court has held that "[w]orking hours and work days are mandatory subjects of collective bargaining" as are "[c]ompany rules concerning employee discipline, smoking and dress." *S.S. Kresge Co. v. NLRB*, 416 F.2d 1225, 1230 nn. 8 and 9 (6th Cir. 1969) (citations omitted).

Here, Beverly Health contends that the Board erred in finding that it violated Sections 8(a)(1) and (5) of the Act by unilaterally implementing revised disciplinary rules, and by

The ALJ also concluded that Beverly Health violated Section 8(a)(1) of the Act by suspending employee Oneita Say for engaging in protected union activity. The ALJ ruled that Beverly Health violated Section 8(a)(1) of the Act by promulgating and maintaining facially invalid disciplinary rules 1.4 and 1.6, which are "overbroad, and tend to interfere with, restrain, and coerce employees in the exercise of their Section 7 rights." In concluding that rule 1.4 was unlawful, the ALJ relied on *Cook Paint & Varnish Co.*, 246 NLRB 646 (1979), and found that an employee would reasonably conclude that he or she would risk discipline by exercising the right not to cooperate in building a case against a fellow employee in a pending arbitration. The ALJ limited his recommended remedy of rescinding the facially invalid rules 1.4 and 1.6 and any discipline issued pursuant to those rules to the 20 facilities listed by the General Counsel in paragraph 2(b) of the amended consolidated complaint**.**

After considering the decision and the record, the Board affirmed the ALJ's rulings. The Board, however, relied on different grounds in holding that the maintenance of rule 1.4 violated Section 8(a)(1) of the Act. The Board concluded that rule 1.4 violates Section 8(a)(1) because it "compel[s] employees to cooperate in unfair labor practice investigations, or risk discipline, [and thus] the rule violates the longstanding principle, established in *Johnnie's Poultry*, 146 NLRB 770, 774-76 (1965), that employees may not be subjected to employer interrogations, relating to Section 7 activity, that reasonably tend to coerce them to make statements adverse to their Section 7 interest, those of fellow employee, or those of the union." In addition, the Board extended the remedy for maintaining facially invalid rules 1.4 and 1.6 to include all of Beverly Health's facilities located in Pennsylvania.

The Board also adopted the recommended order of the ALJ, which required Beverly Health to cease and desist from unilaterally revising and reducing working hours, changing job descriptions, and implementing disciplinary rules, as well as from promulgating and maintaining disciplinary rules 1.4

and 1.6, and suspending or otherwise discriminating against employee Oneita Say or any other employee for engaging in protected union activity.

The Board's order affirmatively requires Beverly Health to rescind the unilaterally implemented disciplinary rules 1.4 and 1.6; rescind the unlawful reduction in hours and the unlawfully issued revised job descriptions and duties; and to make employees whole for losses suffered as a result of unlawful suspension or termination. Beverly Health is also required to post a remedial notice to employees in each of its Pennsylvania facilities.

## II.  STANDARD OF REVIEW

This Court reviews the findings of the Board with respect to questions of fact, and its application of law to the facts, to determine whether they are supported by substantial evidence on the record considered as a whole. 29 U.S.C. § 160(e); *Kentucky General, Inc. v. NLRB*, 177 F.3d 430, 435 (6th Cir. 1999). "Substantial evidence consists of such relevant evidence that a 'reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *NLRB v. General Sec. Servs. Corp.*, 162 F.3d 437, 441 (6th Cir. 1998)). Additionally, "as long as the record as a whole contains substantial evidence supporting the NLRB's findings, this Court must sustain those finding even if we might have reached a different conclusions upon de novo review." *ITT Automotive v. NLRB*, 188 F.3d 375, 384 (6th Cir. 1999); *see also Contech Div., SPX Corp. v. NLRB*, 164 F.3d 297, 306 (6th Cir. 1998); *Kentucky General*, 177 F.3d at 435.

The Board's "[c]onclusions of law are subject to a *de novo* review, although the court will uphold the Board's permissible interpretation of the NLRA where Congress has not spoken to the contrary on the same issue." *Peters v. NLRB*, 153 F.3d 289, 298 (6th Cir. 1998) (citing *"Automatic" Sprinkler Corp. of America v. NLRB*, 120 F.3d 612, 616 (6th Cir. 1997)).

regulations." Further, the Board reasonably inferred that the mere maintenance of the rule, which is overbroad in that it applies to laws and regulations such as unfair labor charges, would have a reasonable tendency to discourage employees from engaging in Section 7 protected activities, or filing charges. As noted above, this Court defers to the Board's assessment of the likely impact of employer conduct on the exercise of employee rights, and does not displace the Board's reasonable inferences, even if we might have reached a different conclusion. *See Kentucky General*, 177 F.3d at 435.

### (2)  Balancing of Interests

Beverly Health also contends that the Board erred because it did not determine whether the legitimate business justification for rule 1.4 outweighs any theoretical interference with the employees' Section 7 rights. Beverly Health asserts that it has ample business justification for rule 1.4 because federal law and state law place legal obligations on nursing homes to investigate any allegation by a patient of patient abuse or neglect. Beverly Health further contends that "[i]f employees could prevent the investigation of such claims by simply refusing to cooperate, then a nursing home could not meet its obligations under federal and state law."

Here, the Board did not conclude that Beverly Health did not have a business justification for the segment of the rule regarding employee cooperation with patient abuse investigations, nor did the Board suggest that a company could not maintain a rule about employer questioning for legitimate purposes that complied with the voluntary requirements established in *Johnnie's Poultry*. Rather, the Board based its finding that rule 1.4 violated Section 8(a)(1) on the findings that the rule was overbroad and that employees were not informed that cooperation was voluntary. For these reasons, the Court affirms the Board's finding that Beverly Health's promulgation and maintenance of rule 1.4 violates Section 8(a)(1) of the Act.

Here, because rule 1.4 compels employee cooperation in the investigation of "laws, or government regulations," the Board concluded that the plain language applied to the investigation of the unfair labor practice charges. By compelling employees to cooperate in unfair labor practice charge investigations, the Board concluded that the rule violated the longstanding principle, established in *Johnnie's Poultry*, that employees cannot be subject to employer interrogations, relating to Section 7 activity, that reasonably tend to coerce them to make statements adverse to their Section 7 interest. The Board concluded that rule 1.4 is a clear violation of Section 8(a)(1) of the Act because cooperation is compelled and the rule fails to inform employees of the voluntary nature of the employer's investigation.

The Board further found the mere maintenance of rule 1.4 unlawful, even without enforcement, because the rule is overbroad and "chill[s] the exercise of employee rights":

The rule inhibits protected, concerted activity. Employees engaged in protected activity run the risk of becoming embroiled in an employer investigation into an alleged unfair labor practice. The rule then forces them to face discipline or cooperate with the employer despite their protected right to make common cause with their fellow employees. Given these unpalatable choices, the rule would clearly have the reasonable tendency to discourage employees from engaging in protected activity, which might bring them under the employer's scrutiny during an unfair labor practices investigation. Alternatively, it could discourage them from exercising their protected right to file unfair labor practice charges for fear of becoming embroiled in such an investigation.

Here, we conclude that the Board reasonably interpreted the scope of rule 1.4 to include the investigation of unfair labor charge complaints based upon the plain language of the rule, which, on its face, compels employee cooperation in the investigation of "Company rules, laws, and government

***A. Is there sufficient proof in the record to support the Board's finding that Beverly Health violated Section 8(a)(1) of the Act by promulgating and maintaining rule 1.4?***

An employer violates Section 8(a)(1) of the Act by "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise of the rights guaranteed in section 157 [Section 7] of this title." 29 U.S.C. § 158(a)(1). Section 7 of the Act provides that

Employees shall have the right to self-organization, to form, join, or assist labor organizations . . . and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection . . .[.]

29 U.S.C. § 157.

Even where "the evidence does not show that employees were actually intimidated or coerced by an employer's conduct," a court may still find a violation of Section 8(a)(1) of the Act. *ITT Automotive*, 188 F.3d at 384. The proper inquiry is whether the evidence "demonstrate[s] that, taken from the point of view of the employees, the reasonable tendency of the employer's conduct or statements is 'coercive in effect.'" *Id.* (quoting *Peabody Coal v. NLRB*, 725 F.2d 357, 363 (6th Cir. 1984)). Under *Montgomery Ward & Co. v. NLRB*, 377 F.2d 452 (6th Cir. 1967), we defer to the Board's assessment of likely impact of employer conduct on the exercise of employee rights, because "[t]he Board, in its expertise, is best able to gauge whether the employer's threat of discharge for failure to answer a questionnaire inhibits employees from invoking or participating in effective Board proceedings." *Id.* at 456.

There was sufficient evidence in the record to support the Board's finding that Beverly Health violated Section 8(a)(1) of the Act by promulgating and maintaining disciplinary rule 1.4. The issue is whether the Board erred in finding that Beverly Health's maintenance of rule 1.4, which compels employees to cooperate, or risk suspension, in the

investigation "of patient (resident) neglect or abuse or any other alleged violation of company rules, laws, or government regulations," interferes with or coerces employees in the exercise of their protected Section 7 rights to engage in union-activities. Beverly Health contends that the Board erred in several respects.

**(1) No Rational Basis and Reliance on *Johnnie's Poultry***

Beverly Health first argues that there was no rational basis for the conclusion that there is a reasonable tendency for rule 1.4 to discourage employees from engaging in union activities. Beverly Health contends as follows:

> In order to find that Rule 1.4 violated the Act, the Board engaged in stretches of logic that have no rational basis . . . [T]he Board looked only at the portion of the Rule stating that the refusal to cooperate applied to any investigation under "laws" or "government regulations." The Board concluded that this language "clearly applies to the investigation of unfair labor practice charges." While technically possible, there is nothing about the language of Rule 1.4 that would suggest that the Rule was developed to address that problem, nor is there any record evidence of the nursing homes ever having used this Rule to investigate unfair labor practices.

Beverly Health also criticizes the Board's reliance on *Johnnie's Poultry*, which held that "where an employer has a legitimate cause to inquire, he may exercise the privilege of interrogating employees on matters involving their Section 7 rights without incurring Section 8(a)(1) liability." 146 NLRB at 774-775.

The Board in *Johnnie's Poultry* articulated two types of legitimate purposes for the inquiry, including (1) the verification of a union's claimed majority status, and (2) "the investigation of facts concerning issues raised in a complaint where such interrogation is necessary in preparing the

employer's defense for trial of the case." *Id*. at 775. The "*employer must communicate to the employee the purpose of the questioning, assure him that no reprisal will take place, and obtain his participation on a voluntary basis . . . .*" *Id.* (emphasis added).

Beverly Health bases its criticism of the Board's reliance on *Johnnie's Poultry* on the grounds that the Eighth Circuit denied enforcement of the case, *NLRB v. Johnnie's Poultry Co.*, 344 F.2d 617, 619 (8th Cir. 1965), and that numerous courts have declined to follow *Johnnie's Poultry* approach of requiring affirmative warnings to employees, in favor of an examination of all the circumstances to determine if questioning is coercive. However, as the Board noted, even courts that have followed the "all the circumstances" approach have not disagreed with the basic premise that cooperation in such investigations must always be voluntary. *See ITT Automotive*, 188 F.3d at 389, n. 9 (stating that "while employing a case-by-case approach . . . this Circuit has never gone so far as to reject the holding of *Johnnie's Poultry*," requiring assurances to the employee and participation on a voluntary basis).

This Court has affirmed the validity of the principle that a union employee's participation in an investigatory interview must be voluntary. As we stated in affirming the Board's finding that a company coercively interrogated its employees:

> The Board found that questioning must occur in a context free from employer hostility, must not be itself coercive, and that employee participation must be obtained on a voluntary basis. *Johnnie's Poultry Co.*, 146 NLRB No. 770. The reversal of this case by the Eighth Circuit, 344 F.2d 617 (1965) has not been regarded as a rejection of these principles.

*Montgomery Ward & Co*, 377 F.2d at 456 (citing *NLRB v. Neuhoff Bros., Packers, Inc.*, 375 F.2d 372 (5th Cir. 1967)).