# United States Court of Appeals
## For the Eighth Circuit

_____

No. 14-3771

_____

ConAgra Foods, Inc.

*Petitioner*

v.

National Labor Relations Board

*Respondent*

United Food and Commercial Workers International Union, Local 75

*Intervenor*

_____

No. 15-1049

_____

ConAgra Foods, Inc.

*Respondent*

v.

National Labor Relations Board

*Petitioner*

United Food and Commercial Workers International Union, Local 75

*Intervenor*

Submitted: November 18, 2015
Filed: February 19, 2016
_____

Before RILEY, Chief Judge, BEAM and KELLY, Circuit Judges.
_____

BEAM, Circuit Judge.

Upon charges filed by the United Food and Commercial Workers International Union, Local 75 (the Union), the National Labor Relations Board (the Board) issued a complaint alleging, as amended, that ConAgra Foods, Inc., violated the National Labor Relations Act (the Act), 29 U.S.C. §§ 151-169, by censuring an employee for soliciting union membership and by posting a sign prohibiting discussion of unions during working time. Additionally, the General Counsel for the Board moved for default judgment against ConAgra under a settlement agreement to an earlier dispute. An Administrative Law Judge (ALJ) ruled in favor of the Union on both allegations, and a divided Board panel affirmed and granted the motion for default judgment. We grant ConAgra's petition for review, set aside the Board's order in part, enforce it in part, and remand for further proceedings.

## I.    BACKGROUND

### A.    Facts

At all times relevant to this dispute, ConAgra has maintained a policy that its employees may not solicit union support or distribute union-related materials during

working time or in work areas. "Working time" and "work areas" include times and areas where employees are expected to be working; they do not include, for example, employee-break times, break rooms, restrooms, parking lots, or hallways. The policy does not prohibit, at any time or place, discussions about unions that do not amount to solicitation. The legality of this policy is not disputed.

In August 2011, the Union began a drive to organize workers at ConAgra's Slim Jims manufacturing plant in Troy, Ohio. Around that time, ConAgra allegedly engaged in certain unfair labor practices, namely removing union literature from employee break rooms and prohibiting discussion of unions during working times and in work areas. ConAgra entered into a settlement agreement with the Union which provided that if ConAgra did not comply with the agreement's terms, the Union would bring charges based on the 2011 conduct and ConAgra would not challenge those allegations.

In April 2012, ConAgra posted a letter on a bulletin board in the plant that read, in part:

> We also wish to remind employees that discussions about unions are covered by our Company's Solicitation policy. That policy says that solicitation for or against unions or other organizations by employees must be limited to non-working times. Distribution of materials is not permitted during working time or in work areas at any time.

The following September, an incident occurred between Janette Haines, an employee and leading proponent of union organization at the plant, and two other plant employees, Megan Courtaway and Andrea Schipper. The exact course of events is disputed. Haines's version is this: She approached Courtaway and Schipper in the

restroom and asked them to re-sign union authorization cards,[1] and they said that they would. A few days later, again in the restroom, Haines asked Schipper if Schipper would like Haines to put the cards in Schipper's locker. Schipper said that she would, gave Haines her locker number, and explained that she and Courtaway shared a locker. Haines proceeded to put three cards in the locker, one for Schipper, one for Courtaway, and one for Courtaway's husband, who was also an employee at the plant. Afterward, Haines walked past Schipper and Courtaway on the production floor of the plant. As she walked by, she said to them, "[H]ey, I put those cards in your locker." Several days passed, and Haines had not yet received signed cards from Schipper or Courtaway. Haines saw them again in the restroom, and asked them if they were reconsidering their decision to sign the cards. Courtaway indicated her husband was having second thoughts, and Haines attempted to persuade them to sign the cards.[2] This was the end of their interaction.

---

[1]A signed union authorization card provides evidence of an employee's intent that the union negotiate with management on the employee's behalf, and thus a sufficient number of signed authorization cards provides a basis to either petition the Board for union elections or for the Board to issue an order recognizing the union as the representative of all employees in the bargaining unit. See 29 U.S.C. § 159(a), (c)(1); NLRB v. Gissel Packaging Co., 395 U.S. 575, 597-99 (1969). Union authorization cards generally must have been signed within a period one year prior to the date the union seeks elections or recognition, Blade-Tribune Publ'g Co., 161 N.L.R.B. 1512, 1523 (1966), remanded in light of Gissel Packaging, 71 L.R.R.M. (BNA) 3104 (9th Cir. 1969), and so although presumably Schipper and Courtaway had previously signed authorization cards, Haines was attempting to obtain newly signed cards for the upcoming year.

[2]Haines testified about this final conversation in the restroom, but neither the ALJ nor the Board referenced it in their respective decisions. Accepting as we do the ALJ's credibility determination and the Board's implicit adoption of Haines's testimony, we infer that the ALJ credited and the Board adopted her entire account of the matter.

Courtaway and Schipper testified to a different version of events. Courtaway testified that she and Haines had only a single conversation, which occurred on the production floor as Haines walked by. Haines told Courtaway that she was going to place cards in Schipper's locker, and that she needed Courtaway and Courtaway's husband to re-sign them. Schipper testified that she was standing nearby during that conversation and overheard it and that Haines only spoke directly to Courtaway. The conversation Schipper testified to overhearing comports with Courtaway's account. Schipper testified that this was the first time she had heard anything from Haines about signing authorization cards and that there were no other conversations with Haines on the subject.

It is undisputed that the encounter on the production floor occurred during working time and in a work area. It is also undisputed that Courtaway was cleaning at that time, that she had to stop cleaning because of the conversation, that Schipper was standing by the production line waiting for it to begin running, and that the conversation was very brief. Afterward, Courtaway and Schipper reported the conversation to management. About a week later, management presented Haines with a verbal warning memorialized by a notice of corrective action, which she signed along with several members of plant management. The notice stated: "On 9/24/12, we received two complaints from your coworkers that you solicited them in a working area, while you and your coworkers were working, and you asked them to sign union cards."

## B.    Procedural History

In response to the warning, the Union filed a charge against ConAgra with the Board, alleging ConAgra violated § 8(a)(1) and (3) of the Act, 29 U.S.C. § 158(a)(1), (3), by censuring Haines. The Acting Regional Director for Region 9 of the Board filed an order consolidating the charge with an earlier filed charge, along with a complaint and a notice of hearing before an ALJ. At the close of the hearing, the

-5-

General Counsel moved to amend the complaint to allege that the posted letter chilled union activity and so also violated § 8(a), and the ALJ granted the motion. The ALJ found that the warning and the posted letter violated the Act, and he dismissed the earlier filed charge. ConAgra filed exceptions to the ALJ's findings and conclusions as to the two violations of the Act. Additionally, the General Counsel moved for default judgment on charges based on the 2011 conduct because the violations of the Act violated the terms of the settlement agreement.

A divided, three-member Board panel affirmed the ALJ's findings, conclusions, and rulings, adopted and modified his recommended order, and granted the motion for default judgment.[3] Although the ALJ credited Haines's, Courtaway's, and Schipper's conflicting testimony, his findings, adopted by the Board, comported with Haines's version. The Board concluded the warning violated the Act because Haines did not engage in solicitation. It found she did not request that Courtaway and Schipper sign an authorization card, noting that the encounter was very brief and that Haines did not present an authorization card for signature at that time. It also concluded the posted letter violated the Act because employees would reasonably interpret the letter as prohibiting protected conduct. Finally, the Board granted default judgment on the 2011 charges on the ground that the warning violated the terms of the settlement agreement. ConAgra petitions for review of the Board's

_____

[3]The General Counsel did not file an exception to the dismissal of the earlier filed charge, and so it was not addressed by the Board. The ALJ did find, however, that Haines's warning was motivated by retaliation for the incident described in that charge. Only one member of the two-member majority adopted this finding, and in any event the Board stated that antiunion animus is only relevant where the reason for the discipline is in dispute. See Wright Line, 251 N.L.R.B. 1083 (1980), enforced, 662 F.2d 899 (1st Cir. 1981). Because it was not a finding adopted by a majority of the panel and because neither the Board nor the Union disputes ConAgra's claimed reason for disciplining Haines, we do not address the issue of retaliatory discipline here.

decision and order, the Board cross-petitions for enforcement of its order, and the Union intervenes.

## II.    DISCUSSION

Section 7 of the Act, 29 U.S.C. § 157, recognizes the right of employees to form, join, or assist labor organizations, to bargain collectively with their employer, to engage in activities toward those ends, or to refrain from such activities.  Section 8 makes it an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of" this right, 29 U.S.C. § 158(a)(1), or "by discrimination in regard to . . . any term or condition of employment to encourage or discourage membership in any labor organization."  Id. § 158(a)(3).

The issues for review are whether ConAgra violated the Act when it censured Haines and when it posted the letter explaining its no-solicitation policy, and if so whether these violations provided a basis for default judgment under the settlement agreement.  We afford great deference to the Board where, as here, it has affirmed the ALJ's findings.  Town & Country Elec., Inc. v. NLRB, 106 F.3d 816, 819 (8th Cir. 1997).  "We will enforce the Board's order if the Board has correctly applied the law and its factual findings are supported by substantial evidence on the record as a whole, even if we might have reached a different decision had the matter been before us de novo."  Id.  "Substantial evidence is more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  NLRB v. La-Z-Boy Midwest, 390 F.3d 1054, 1058 (8th Cir. 2004) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).

### A.    The Verbal Warning

#### 1.    The Conflicting Testimony

As an initial matter, we address whether we rely on Haines's or Courtaway and Schipper's version of events.  "The rule in this Circuit is that 'the question of credibility of witnesses and the weight to be given their testimony' in labor cases is primarily one for determination by the trier of facts."  NLRB v. Midwest Hanger Co., 550 F.2d 1101, 1104 (8th Cir. 1977) (quoting NLRB v. Morrison Cafeteria Co. of Little Rock, 311 F.2d 534, 538 (8th Cir. 1963)). Credibility determinations, like other findings of fact, are conclusive if  "supported by substantial evidence on the record considered as a whole." 29 U.S.C. § 160(f).[4]  ConAgra argues that Haines's version is not supported by substantial evidence.  It points both to Courtaway's and Schipper's conflicting accounts and to the notice of corrective action Haines signed.  The Board and the Union argue that Courtaway's and Schipper's testimony is less credible than Haines's.

The ALJ credited the testimony of Haines, Courtaway, and Schipper without acknowledging that their accounts were markedly contradictory.  Although the ALJ credited Courtaway's and Schipper's accounts, we believe the Board's implied adoption of Haines's version was supported by substantial evidence. In her testimony, Haines recalled Schipper's locker number, which comports with her account of Schipper having provided her that information.  Furthermore, Haines testified that she

---

[4]We have reviewed credibility determinations in labor cases in particular under a shock-the-conscience test, Midwest Hanger, 550 F.3d at 1104;  Morrison Cafeteria, 311 F.2d at 538, but we have stated that "[a]lthough we see no inherent conflict between the shock-the-conscience standard of review and the earlier and more traditional[, substantial-evidence] standard . . . , we prefer to apply the latter standard, based as it is on the teachings of Universal Camera[Corp. v. NLRB, 340 U.S. 474 (1951)]."  Town & Country, 106 F.3d at 820.

passed Courtaway and Schipper on her way to perform cleaning chores that she completed at the beginning of her shift, before the production lines began running. Schipper testified she saw Haines carrying cleaning supplies, corroborating Haines's testimony. Finally, Schipper testified that she and Courtaway took the authorization cards from their locker to management twenty minutes after the encounter. This tends to support Haines's testimony that she had already placed the cards in the locker when she spoke to Courtaway and Schipper because Haines was on her way to begin her shift during the encounter. ConAgra rightly points to contrary evidence supporting Courtaway and Schipper's version. In ascertaining substantiality of the evidence, however, we may not "displace the Board's choice between two fairly conflicting views, even though [we] would justifiably have made a different choice had the matter been before [us] *de novo*." Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951). Therefore, we adopt the Board's findings of fact that accord with Haines's testimony.

### 2. Whether Haines Engaged in Solicitation

The issue remains whether ConAgra violated the Act when it censured Haines. This turns on whether Haines engaged in activity protected under the Act. If Haines was soliciting union support during working time in violation of ConAgra's no-solicitation policy, then her actions were not protected and ConAgra was within its rights to censure them. The Board concluded:

> Haines' statement on the production floor that she had placed authorization cards in her fellow employees' locker did not constitute "solicitation." There was no request, i.e., no solicitation of Schipper and Courtaway to sign cards during this brief interaction, and there were no cards presented for their signature. Instead, Haines simply informed Schipper and Courtaway that the authorization cards *they had already agreed to sign* (in a conversation in the restroom during a break) were in their locker. Unlike the conduct found to be solicitation in prior

cases, Haines' comment was not a request to take any action and posed no reasonable risk of interfering with production because it did not call for a response of any kind. Indeed, her information was conveyed in, at most, a few seconds. Accordingly, the Respondent violated Section 8(a)(3) when it issued Haines a verbal warning because she engaged in protected union activity.

ConAgra Foods, Inc., 361 N.L.R.B. No. 113, 2014 WL 6632914, at *3 (Nov. 21, 2014) (citation omitted).

The Board's reasoning bears mention in two respects. First, it contained the legal conclusion that for a statement to amount to solicitation of union support it must have been accompanied at that time by the presentation of an authorization card for signature.[5] Second, the Board also considered the duration of the act in question in determining whether it amounted to solicitation. Because Haines did not present a card for signature and because her statement (and the corresponding hiatus in Courtaway's work) was very brief, the Board made a factual finding that Haines's statement was not a request that Schipper and Courtaway sign their cards. We address each of these aspects of the Board's decision in turn.

> ### a. Whether Solicitation Requires the Presentation of a Card for Signature and the Presence of an Actual Disruption

We first examine whether the Board correctly applied the law. ConAgra asserts, incorrectly, that our review of the Board's legal conclusions is de novo. Although the word "solicitation" is not found in the Act, the Board's definition of that term forms, in part, the contours of rights guaranteed employees under the Act and so amounts to a construction of it. "The Board's construction of the Act is 'entitled

___

[5]The Union does not take this position, arguing merely that the absence of a card "merely buttresses the finding" that Haines did not make a request.

to considerable deference,' and must be upheld if it is reasonable and consistent with the policies of the Act." St. John's Mercy Health Sys. v. NLRB, 436 F.3d 843, 846 (8th Cir. 2006) (citation omitted) (quoting Ford Motor Co. v. NLRB, 441 U.S. 488, 495 (1979)).[6] ConAgra argues that the Board defined solicitation in an unreasonable manner inconsistent with the Board's own precedent. It also asserts that the Board's definition would create practical problems for employers. The Board responds that it has always held that the presentation of an authorization card for signature at the time is a necessary component of solicitation.

In Republic Aviation Corp. v. NLRB, 324 U.S. 793, 798 (1945), the Supreme Court made clear that the "purpose [of the Act] is the right of employes [sic] to organize for mutual aid without employer interference," but that the Board must adjust that right to "the equally undisputed right of employers to maintain discipline in their establishments." This accommodation between employees' right to organize and employers' property rights "must be obtained with as little destruction of one as is consistent with the maintenance of the other." NLRB v. Babcock & Wilcox Co., 351 U.S. 105, 112 (1956). To that end, the Court has endorsed the Board's balancing of those rights as they pertain to solicitation of union support:

> The Act, of course, does not prevent an employer from making and enforcing reasonable rules covering the conduct of employees on company time. Working time is for work. It is therefore within the province of an employer to promulgate and enforce a rule prohibiting union solicitation during working hours. Such a rule must be presumed to be valid in the absence of evidence that it was adopted for a discriminatory purpose.

---

[6]We note that we see no substantive difference between this articulation of our standard of deference and the one put forth in Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837, 843 (1984), i.e., "whether the agency's answer is based on a permissible construction of the statute."

Republic Aviation, 324 U.S. at 803 & n.10 (quoting Peyton Packing Co., 49 N.L.R.B. 828, 843 (1943)).[7]  By contrast, no-solicitation rules applicable to nonworking times and areas are presumptively *invalid* absent a showing of special circumstances showing the rule is necessary to maintain discipline and production. Id. at 803 & n.10, 804.  As the dissenting Board member pointed out, these presumptions form long-established and clear rules of the road that best strike the balance between and maintenance of the rights of employers and employees that Republic Aviation and Babcock & Wilcox declared to be policy objectives of the Act.

Another "underlying purpose of this statute is industrial peace."  Brooks v. NLRB, 348 U.S. 96, 103 (1954).  The distinction between working and nonworking times and areas furthers this objective by providing an easily ascertainable standard upon which employers can rely so as to avoid fact-specific conflicts each time they enforce their policies.  The Peyton Packing presumption fosters such predictability, and thus industrial stability, through consistent application of the Act, providing clear boundaries to employers and employees.

The Board majority characterized solicitation of union membership as a request demanding immediate action and drew from this understanding the conclusion that such a request must be accompanied by the physical presence of an authorization card presented for signature. The Board reasoned that "drawing the 'solicitation' line at the presentation of a card for signature makes sense because it is that act which 'prompts

_____

[7]We note this decision was written before the Board adopted its distinction between "working time," which excludes employee breaks, and "working hours," which does not.  See Essex Int'l, Inc., 211 N.L.R.B. 749, 750 (1974).  The presumption set out in Peyton Packing has remained applicable to no-solicitation policies that, like ConAgra's, are limited to working time. Midland Transp. Co. v. NLRB, 962 F.2d 1323, 1326 (8th Cir. 1992).

an immediate response from the individual or individuals being solicited and therefore presents a greater potential for interference with employer productivity.'" ConAgra, 2014 WL 6632914, at *2 (quoting Wal-Mart Stores, Inc., 340 N.L.R.B. 637, 639 (2003), enforcement denied in relevant part, 400 F.3d 1093 (8th Cir. 2005)). For several reasons, we disagree.

First, contrary to the Board's assertion, it has not "consistently held" that the presentation of an authorization card for signature at the time of solicitation is required. See, e.g., Home Depot, U.S.A., Inc., 317 N.L.R.B. 732, 732-33, 736 (1995) (wearing a union button, asking employees if they had complaints about their job, and passing out business cards constituted solicitation); Uniflite, Inc., 233 N.L.R.B. 1108, 1109, 1111 (1977) (affirming ALJ's finding of the same where solicitor discussed union, stated he could get an authorization card, and suggested more information could be obtained from member of union organization committee); The J.L. Hudson Co., 198 N.L.R.B. 172, 178 (1972) (affirming ALJ's finding that 3 to 5 minute conversation informing employees that the union had obtained membership cards, asking if they had signed one, and stating that they ought to "was solicitation to union membership pure and simple"). But see Wal-Mart, 340 N.L.R.B. at 638-39 ("[A]n integral part of the solicitation process is the actual presentation of an authorization card to an employee for signature at that time."); Farah Mfg. Co., 187 N.L.R.B. 601, 602 (1970) ("The presentation of an authorization card to an employee for signature in the course of oral solicitation is therefore necessarily an integral and important part of the solicitation process.").

Second, a categorical rule such as this would be contrary to the Act's policy of balancing the rights of employers and employees. It would tilt that balance toward employees by providing a road map to organizers on how to garner support for union membership on working time and in work areas. Moreover, it would prevent employers from maintaining production and discipline. The likelihood of disruption

-13-

from solicitation does not arise solely from the possibility that an employee would be made to sign their name to a card. That likelihood exists because an entreaty from an organizer to support the union is inherently disruptive. The act of persuasion demands attention from the listener and draws attention away from production. See United States v. Kokinda, 497 U.S. 720, 734-35 (1990) (characterizing solicitation in First Amendment context as disruptive because "one must listen, comprehend, decide, and act in order to respond to a solicitation"). Limiting union-membership solicitation to situations where a card is presented for signature prevents the employer from prohibiting much de facto solicitation, and alters the balance of rights set out in Peyton Packing decidedly in favor of employees.

Finally, the requirement that an authorization card be presented for signature at the time of the solicitation is patently unreasonable. Under the Board's construction of the Act, an employee cannot be prohibited under a valid no-solicitation policy from requesting support for union organization from another employee in the most explicit terms, putting a pen in his fellow employee's hand, so long as he directs the solicited party to sign a card only at the end of the shift. To hold that an employer would violate the Act by censuring such clearly solicitous activity seems to us absurd, straying far afield of what employers, employees, and prior Board decisions have understood solicitation, in its ordinary sense, to entail.

The Board also indicated that the brief duration of the encounter–the extent to which Haines's statement was actually disruptive–precluded a finding that she solicited Courtaway and Schipper. It wrote: "[A] momentary interruption in work, or even a risk of interruption, [does not] subject employees to discipline for conveying such union-related information." ConAgra Foods, Inc., 2014 WL 6632914, at *3. The Board's analysis risks upending a long-understood distinction between those conversations that are merely union related and those that solicit union membership. The general rule is that "[n]o restriction may be placed on the

-14-

employees' right to discuss self-organization among themselves, unless the employer can demonstrate that a restriction is necessary to maintain production or discipline," Babcock & Wilcox, 351 U.S. at 113, and this necessity is presumed as to solicitation in times and places in which it carries the risk of disruption. See Stoddard-Quirk Mfg. Co., 138 N.L.R.B. 615, 619-21 (1962).

Accordingly, an employer may censure *any* discussion–about unions, the weather, or anything else–that is sufficiently disruptive. But when that discussion solicits union support it may be subject to a blanket prohibition by an employer during working time. To define solicitation as only those statements that are, in fact, sufficiently disruptive because an authorization card is presented removes this distinction. Of course, once it is determined that a statement or conversation is merely a discussion of unions, rather than a solicitation of union membership, the question of whether that statement or conversation is disruptive becomes determinative of whether the employer may censure it. But the presence or absence of a disruption cannot itself be the test for whether a no-solicitation policy has been violated, except to the limited extent that it may shed light on the statement's nature or intent.

Under the Board's application of the Act in this instance, de facto solicitation that is sufficiently brief and nondisruptive is protected conduct that may not be censured under a valid no-solicitation policy. This understanding disturbs the balance of employees' right to organize and employers' right to exercise control over their business. Employees' right to organization would wax to include de facto solicitation that the employer could not show to be sufficiently disruptive, which would result in the waning of employers' property rights. This shift is, in our view, contrary to the Act's policy of balancing and maintaining those rights set out in Republic Aviation and Babcock & Wilcox. In addition, such a shift risks creating a dispute over each nondiscriminatory application of a valid rule, obligating the Board to engage in a

-15-

fact-specific inquiry to determine whether a particular act of solicitation does in fact disrupt production. This would be contrary to the Act's objective of work place stability.

Thus, we hold that in answering the factual question of whether a statement amounts to solicitation of union support, neither the presentation of a card for signature at the time nor the duration of the conversation are determinative. We conclude that the Board's novel construction of the Act in this case is unreasonable, contrary to the policies of the Act, and therefore an incorrect application of the law.

### b.      Whether Haines's Statement Constituted Solicitation of Union Membership

We next determine whether the Board's factual finding that Haines's statement did not amount to solicitation is supported by substantial evidence. ConAgra argues that Courtaway's and Schipper's testimony and the notice of corrective action signed by Haines objectively contradict Haines's account, and so the Board's finding that Haines did not request a signature is unsupported by substantial evidence. The Board and the Union counter that Haines's account shows that she merely provided information and did not request a signature. As we have stated, we accept at the outset Haines's version of events–that she stated, "[H]ey, I put those cards in your locker."

The Board's definition of solicitation was laid out thoroughly in W.W. Grainger, Inc., 229 N.L.R.B. 161 (1977), enforced, 582 F.2d 1118 (7th Cir. 1978):

> It should be clear that "solicitation" for a union is not the same thing as talking about a union or a union meeting or whether a union is good or bad. "Solicitation" for a union usually means asking someone to join the union by signing his name to an authorization card in the

same way that solicitation for a charity would mean asking an employee to contribute to a charitable organization or having the employee sign a chance book for such a cause or in the commercial context asking an employee to buy a product or exhibiting the product for him from a book or showing the product.

229 N.L.R.B. at 166. Nothing in this definition requires that an employee utter an express question or command to solicit union membership. A concrete effort to obtain a signature on an authorization card directed from one person to another, without more, is sufficient. This understanding comports both with prior Board precedent such as Home Depot, Uniflite, and J.L. Hudson, and with the ordinary understanding of that term as to "ask for or try to obtain (something) from someone." *Solicit*, New Oxford American Dictionary (3d ed. 2010).

Our prior decision in Wal-Mart Stores, Inc. v. NLRB, 400 F.3d 1093 (8th Cir. 2005), is instructive, as it examined solicitation in a range of circumstances. In Wal-Mart, an employee, Shieldnight, was censured by his employers for (1) wearing a t-shirt that read, "Sign a card . . . Ask me how," (2) inviting other employees to a union meeting being held that evening, and (3) stating that he would like another employee (Starr) to consider signing a union authorization card. Id. at 1096-97. We concluded that the Board's finding that the statement on the t-shirt was not solicitation was supported by substantial evidence because "[a]nyone, including any Wal-Mart employee . . . , was free to ignore both Shieldnight and the message on the t-shirt." Id. at 1098. We also affirmed the Board's finding that inviting another employee to a union meeting was not solicitation. "Instead of a solicitation that required a response, the record shows that Shieldnight's statements were more akin to a statement of fact that put his co-workers on notice that there was to be a union meeting that night and that they were welcome to attend." Id. at 1099.

-17-

We concluded, however, that "[i]n light of the totality of the circumstances," Shieldnight's statement that he would like for Starr to sign an authorization card did constitute solicitation. Id. We noted that Starr "understood the exchange as a request to sign the card, an understanding likely to be reached by the average person in a similar situation." Id. We also noted that "[t]here is little doubt as to Shieldnight's intent in the words he spoke to Starr," and "[t]he fact that [Shieldnight] did not place a card directly in front of Starr at the time of his statement makes little difference in regard to the nature of his conversation." Id. at 1099-1100. Accordingly, the nature of the statement, the intent of the putative solicitor, the understanding of the listener relative to that of an average person, and the surrounding circumstances guide our analysis.

Haines's efforts to obtain signatures from Courtaway, Schipper, and Courtaway's husband both before and after the encounter on the production floor made her intent clear. Her statement was intended to urge Courtaway and Schipper to sign the cards that she had placed in their locker. Courtaway's and Schipper's testimony shows they understood Haines's statement as a request for a signature, and under the circumstances an average person would do the same. That Haines's statement was not phrased in the imperative does not change its nature; the implicated request was clearly intended and understood by all parties. The substance of Haines's actions in the context of her extended effort to obtain signatures from Courtaway, Schipper, and Courtaway's husband points to the conclusion that the encounter on the production floor should be seen as a component part of those efforts, and therefore an act of solicitation which occurred, indisputably, on working time and in a working area.

Looking to the record as a whole, we conclude that there is not substantial evidence supporting the finding that Haines did not engage in solicitation. The Board cites no evidence that Haines was merely providing information divorced from an

effort to obtain signed authorization cards. To the contrary, all indications in the record point to Haines's statement as part of a prolonged effort of soliciting union support from Courtaway, Schipper, and Courtaway's husband. We acknowledge that these facts present a close case. Our holding should not be read to indicate that merely mentioning union authorization cards or providing information, without more, constitutes solicitation. But where an employee makes a statement that is intended and understood as an effort to obtain a signed card, and that effort is part of a concerted series of interactions calculated to acquire support for union organization, that employee has engaged in solicitation subject to censure under an employer's validly enacted and applied no-solicitation policy. We therefore reverse the Board's conclusion that ConAgra violated the Act when it censured Haines for violating its no-solicitation policy.

## B. The Posted Letter

Next, we look to the Board's conclusion that ConAgra violated the Act by posting an overbroad no-solicitation rule. A workplace rule is overbroad and thereby violates § 8(a)(1) of the Act if it "would reasonably tend to chill employees in the exercise of their Section 7 rights." Lafayette Park Hotel, 326 N.L.R.B. 824, 829 (1998), enforced, 203 F.3d 52 (D.C. Cir. 1999). The Board found the letter would be construed by employees as prohibiting any discussion of unions during working time, including discussions protected under the Act.

ConAgra argues that the Board looked only at the phrase "discussions about unions are covered by our Company's Solicitation policy" and failed to consider that phrase in the context of the entire letter. It argues the following sentence clarified that the no-solicitation policy did not apply to discussions about unions, and it argues the Board improperly interpreted "covered" to mean "prohibited." ConAgra contends that this is in contravention of Board precedent and that the General Counsel failed

to produce any employees who testified to understanding the letter the way the Board concluded they would. The Board counters that it did not read any part of the letter in isolation, and it argues evidence of employees' interpretation or actual enforcement is not necessary for a finding that a policy is overbroad.

We conclude the Board's finding is supported by substantial evidence. The structure of the letter creates the potential for confusion, inviting the reader to equate "discussions about unions" with solicitation. Employees not familiar with the fine legal distinctions between these terms would reasonably tend to read the letter as a prohibition of any discussion about unions during working time. It is apparent the Board reached this conclusion by examining the letter in its entirety. To the extent ConAgra presents a reasonable alternative reading, "any ambiguity in the rule must be construed against the Respondent as the promulgator of the rule." Lafayette Park Hotel, 326 N.L.R.B. at 828. Furthermore, "merely maintaining an overly broad rule violates the Act," Beverly Health & Rehab. Servs., Inc., 332 N.L.R.B. 347, 349 (2000), enforced, 297 F.3d 468 (6th Cir. 2002), and "[e]vidence of enforcement of the rule is not required to find a violation of the Act." Id. We affirm the Board's conclusion that ConAgra violated the Act by maintaining an overly broad rule.

## C.    Default Judgment on the 2011 Claims

The Board asks us to summarily enforce their order entering default judgment on the claims arising from ConAgra's 2011 conduct.[8] In its decision, the Board stated

---

[8]The Board argues that ConAgra has waived any challenge to the General Counsel's motion for default judgment because it did not address that subject in its opening brief. Although we have indeed summarily enforced uncontested portions of the Board's order, e.g., NLRB v. Bolivar-Tees, Inc., 551 F.3d 722, 727 (8th Cir. 2008), ConAgra contests the only bases upon which the Board could have granted the motion. This is, in substance, a challenge to the default judgment and we exercise our

it was granting the General Counsel's motion only on the ground that Haines's warning violated the Act and thereby the settlement agreement. The Board declined to address ConAgra's argument that the posted-letter violation would not support the granting of default judgment. Because we decline to enforce the Board's order as to the warning, we likewise refrain from enforcing the default judgment and remand the case to the Board to determine whether the posted-letter violation constitutes grounds for granting the General Counsel's motion.

## III. CONCLUSION

Accordingly, for the reasons stated herein: we reverse the Board's conclusion that ConAgra violated § 8(a)(1) and (3) of the Act when it issued Janette Haines a verbal warning on October 2, 2012, and consequently reverse the Board's grant of the General Counsel's motion for default judgment, thus setting aside parts (1)(b)-(e) and (2)(b) of the order; we affirm the Board's conclusion that ConAgra violated § 8(a)(1) of the Act by maintaining overbroad work rules regarding its solicitation policy and enforce parts 1(a), (f), 2(a) as it pertains to the April 30, 2012, violation, and 2(d) of the order, and part 2(c) with the understanding that the Board will modify the attached notice consistent with this opinion; and we remand this case to the Board to determine whether ConAgra's violation of § 8(a)(1) constitutes a basis upon which to grant the General Counsel's motion for default judgment.

KELLY, Circuit Judge, concurring in part and dissenting in part.

I respectfully dissent as to Part II.A.2.b. of the court's decision. I would conclude, after looking to the record as a whole and accepting the facts as stated in

discretion under 29 U.S.C. § 160(e) to deny enforcement should there be no grounds to grant the motion.

-21-

Part I.A. of the court's opinion, that substantial evidence does support the Board's conclusion that Haines did not engage in solicitation. I concur in the rest of the opinion, but not in the judgment reversing the Board's conclusion that ConAgra violated the Act when it censured Haines for violating its no-solicitation policy.

According to Haines's version of events, which the court adopts, Schipper and Courtaway were in the restroom when they agreed to re-sign union authorization cards and when Schipper agreed that Haines could place the cards in her locker. Later, on the production floor, Haines said, "I put those cards in your locker." I agree that the production-floor statement is not divorced from Haines's initial effort to obtain their signatures, but that does not necessarily mean the statement qualified as solicitation. To the contrary, by the time she made the production-floor statement, Haines's initial restroom-based effort to convince Courtaway and Schipper to sign the union authorization cards had concluded: Courtaway and Schipper had agreed to re-sign cards. "Instead of a solicitation that required a response, the record shows that [Haines's] statement [was] more akin to a statement of fact." See Wal-Mart Stores, Inc. v. N.L.R.B., 400 F.3d 1093, 1099 (8th Cir. 2005).

I agree with the court that this case presents a close call. And I agree that providing information or mentioning union authorization cards, without more, is not solicitation. But I disagree that the conversation in the restroom and Haines's statement on the production floor amounted to a *single* concerted effort to obtain signatures. Based on the record presented, I would conclude there is substantial evidence to support the Board's finding that Haines did not engage in solicitation. See Town & Country Elec., Inc. v. N.L.R.B., 106 F.3d 816, 819 (8th Cir. 1997) (noting the great deference we afford the Board's affirmation of an ALJ's findings).

———————————————————